UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
PETER SABILIA and EARTH
POWERED ENERGY, LLC,                  :

                  Plaintiffs,         :      **REPORT & RECOMMENDATION**

        -against-                     :      **11 Civ. 739 (JPO)(MHD)**

THOMAS E. RICHMOND, TOM C.            :
PLUMMER, RONALD J. BROOKS,
and PATRICK CHARLES,                  :

                  Defendants.         :

--------------------------------x

TO THE HONORABLE J. PAUL OETKEN, U.S.D.J.:


    Plaintiffs, Peter Sabilia ("Sabilia") and Earth Powered
Energy, LLC ("EPE"), filed this lawsuit on February 2, 2011,
asserting principally that the four individual defendants, Thomas
E. Richmond ("Richmond"), Ronald J. Brooks ("Brooks"), Patrick
Charles ("Charles"), and Tom C. Plummer ("Plummer"), fraudulently
induced Sabilia to give them his life savings and the equity from
his home, totaling $500,000.00. (Compl. ¶ 9).


    According to the complaint, Sabilia entrusted this sum to
defendants with the understanding that it would be used to obtain
a €35 million loan for plaintiffs, who intended to use it to
purchase an interest in an energy company, GTherm, Inc. ("GTI"),

1

and finance its development. (Id. ¶¶ 9-13, 16, 20-22). Rather than take steps to secure the loan, defendants allegedly misappropriated the funds from Sabilia despite repeatedly and fraudulently asserting that the loan was forthcoming. (See generally id. ¶¶ 13-71).

Plaintiffs assert claims for fraud, conversion, equitable and promissory estoppel, negligent misrepresentation, conspiracy, aiding and abetting fraud and conversion, breach of contract, and unjust enrichment. (Id. ¶¶ 72-124). Plaintiffs' complaint asserts that two of the defendants, Richmond and Plummer, purported to be, or to represent, foreign entities capable of loaning plaintiffs money in exchange for a $500,000.00 deposit. (Id. ¶¶ 12-15). Richmond claimed to represent a Costa Rican entity called Credito Accesible, SA ("CASA" or "Costa Rican Shell") while Plummer purported to represent The Commercial Depository Trust of Switzerland, AG ("CDT" or "Swiss Shell"), a Swiss corporation. (Id.).[1] Plaintiffs allege that CASA and CDT were mere shell corporations without the ability or the intention to provide plaintiffs the promised loan funding. (See, e.g., id. ¶¶ 14-15). Instead of using plaintiffs' funds to obtain a loan, defendants

---

[1] Neither CASA nor CDT are named defendants.

began dissipating the $500,000.00 shortly after receiving it. (Id. ¶¶ 24-27, 30, 37, 42-43, 45, 53, 62). In addition, according to the complaint, defendants repeatedly told plaintiffs that they had to take additional steps in order to obtain the loan funds, and fabricated funding and other issues with third parties, in order to stall plaintiffs from taking legal action. (Id. ¶¶ 28-71). Defendants ultimately repaid Sabilia only $28,000, a fraction of the money that plaintiffs had provided. (Id. ¶ 71).

Plaintiffs initially notified the Court of a settlement with defendants Richmond, Brooks, and Charles in March of 2011. (See Pls.' Mem. in Opp'n 6; Decl. of Andrez S. Carberry, Esq., in Opp'n to Def. Plummer's Mot. Dismiss ("Carberry Decl.") ¶ 2 & Ex. A). During the pendency of the current motion, the Court received an answer from defendant Richmond, filed August 15, 2011, and entered a Stipulation and Order of Discontinuance Without Prejudice as to defendant Ronald J. Brooks on August 17, 2011. The Court has yet to receive any filing from defendant Charles.

Defendant Plummer, appearing pro se, filed an answer and an amended answer, and subsequently moved to dismiss the complaint. Plummer's rambling and convoluted motion asserts several overlapping grounds for dismissal: first, that plaintiffs failed to

3

allege facts sufficient to pierce the veil of CDT and sue Plummer in his individual capacity (Def.'s Mot. Dismiss 9-15, 25-29); second, that plaintiffs failed to allege facts sufficient to establish that Richmond acted as Plummer's agent (id.); third, that New York is an improper venue (id. at 15-23); fourth, that plaintiff failed to plead fraud with the requisite specificity (id. at 24-29); fifth, that plaintiffs failed to state a claim for relief or adequately allege their various causes of action (id. at 29-32, 36-60); sixth, that an arbitration clause in an alleged contract between EPE and non-party CASA requires the parties to arbitrate the case in Switzerland (id. at 32-36); and, finally, that plaintiffs failed to join CDT as an indispensable party. (Id. at 60-63).

For the following reasons, we recommend that Plummer's motion to dismiss for failure to state a claim be granted as to plaintiffs' claims of negligent misrepresentation, civil conspiracy, aiding and abetting fraud and conversion, and equitable estoppel, and denied in all other respects.

<u>ANALYSIS</u>

We begin by addressing Plummer's contentions regarding venue,

4

mandatory arbitration, and compulsory joinder. We then turn to
Plummer's argument that plaintiffs failed to state a valid claim
for relief under either Rule 12(b)(6) or Rule 9(b). For each of
Plummer's arguments, we briefly state the applicable substantive
standards and then apply them to the case at hand.


A. Venue


Defendant asserts that venue is improper in this district and
requests dismissal under Rule 12(b)(3). (Def.'s Mot. Dismiss 15-
32). "On a motion to dismiss a complaint under Rule 12(b)(3) for
improper venue, 'the plaintiff bears the burden of establishing
that venue is proper.'" Cold Spring Harbor Lab. v. Ropes & Gray
LLP, 762 F. Supp.2d 543, 551 (E.D.N.Y. 2011) (quoting French
Transit v. Modern Coupon Sys., 858 F. Supp. 22, 25 (S.D.N.Y.
1994)). "If the court chooses to rely on pleadings and affidavits,
the plaintiff need only make a prima facie showing of [venue]."
Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 355 (2d Cir. 2005)
(alteration in original) (quoting CutCo Indus. v. Naughton, 806
F.2d 361, 364-65 (2d Cir. 1986)). In analyzing whether plaintiffs
made such a prima facie showing, we must view all facts in the
light most favorable to the plaintiff. Phillips v. Audio Active,
Ltd., 494 F.3d 378, 384 (2d Cir. 2007) (citing New Moon Shipping

Co. v. MAN B & W Diesel AG, 121 F.3d 24, 29 (2d Cir. 1997)). We
must also take allegations in the complaint as true, unless
contradicted by the defendants' affidavits. U.S. Envtl. Prot.
Agency ex rel. McKeown v. Port Auth., 162 F. Supp.2d 173, 183
(S.D.N.Y. 2001) (citing 5A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure: Civil 2d § 1352 (2d ed. 1990 &
Supp. 1999)). If plaintiffs' allegations are so challenged, we "may
examine facts outside the complaint to determine whether venue is
proper . . . [but] must draw all reasonable inferences and resolve
all factual conflicts in favor of the plaintiff." Id.

Because our jurisdiction over this action is founded solely on
diversity of citizenship,[2] proper venue is defined pursuant to 28
U.S.C. § 1391(a). Under that provision, venue is proper in

> (1) a judicial district where any defendant resides, if
> all defendants reside in the same State, (2) a judicial
> district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a
> substantial part of property that is the subject of the
> action is situated, or (3) a judicial district in which
> any defendant is subject to personal jurisdiction at the

---

[2] Plaintiff Sabilia is a citizen and resident of
Pennsylvania and plaintiff EPE is a Delaware-based corporation
with its principal place of business in New Jersey. Defendants
Richmond and Brooks are citizens and residents of New York,
defendant Charles is a citizen and resident of Colorado, and
defendant Plummer is a citizen and resident of Tennessee. (Compl.
¶¶ 1-7).

time the action is commenced, if there is no district in
which the action may otherwise be brought.

28 U.S.C. § 1391(a).

According to the complaint, defendants reside in three
different states. (Compl. ¶¶ 3-6). Thus section 1391(a)(1) plainly
does not apply because all of the defendants do not reside in the
same state.

Plaintiffs do not assert that this action could not be brought
outside this district; they appear to concede in their opposition
that venue "may be appropriate" in the Eastern District of
Pennsylvania, the District of New Jersey, or the District of
Delaware. (Pls.' Mem. in Opp'n 9). Therefore, we assume that
section 1391(a)(3) also does not apply in this case, as there exist
a number of potentially proper venues.

Hence we turn our attention to section 1391(a)(2). The
relevant inquiry under this section is whether plaintiffs
demonstrated that "a substantial part of the events or omissions
giving rise to [plaintiffs'] claim occurred" in this district. 28
U.S.C. § 1391(a)(2); cf. Prospect Capital Corp. v. Bender, 2009 WL
4907121, at *2 (S.D.N.Y. Dec. 21, 2009).

7

The Second Circuit has noted that "when a plaintiff relies on § 1391(b)(2) to defeat a venue challenge, a two-part inquiry is appropriate. First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims. Second, the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed, that is, whether 'significant events or omissions material to [those] claims . . . have occurred in the district in question.'" Daniel v. Am. Board of Emergency Med., 428 F.3d 408, 432 (2d Cir. 2005) (alteration in original) (internal citations omitted) (quoting Gulf Ins. Co., 417 F.3d at 357). Since the text of section 1391(a)(2) is identical to that of section 1391(b)(2), we presume that the same two-part inquiry applies to this action. See id. (citing First of Mich. Corp. v, Bramlet, 141 F.3d 260, 264 (6th Cir. 1998)) (noting that pertinent language in section 1391(a)(2) is "analogous" to that in section 1391(b)(2)).

In this case, all of plaintiffs' claims center around defendants' receipt of $500,000.00 in escrow funds from plaintiffs in exchange for an allegedly forthcoming €35 million loan, after which defendants refused to either provide the loan or return the escrowed funds. (See generally Compl. ¶¶ 28-71). The acts and omissions giving rise to these claims include: (1) plaintiffs'

8

communications with defendants before, during, and after the funds'
transmission; (2) the transmission of the $500,000.00 to defendants
(including, in particular, the transmission of the $500,000.00 from
Brooks in Manhattan to Plummer in Tennessee); and (3) defendants'
alleged failure to either provide the promised loan funds to
plaintiffs or return the $500,000.00. (Id.). We therefore must
examine whether a "substantial part" of these acts and omissions
occurred in the Southern District of New York.

As for the communications between plaintiffs and defendants,
"[a]n action satisfies the requirements of Section 1391(a)(2) if a
communication was 'transmitted to or from the district in which the
cause of action was filed, given a sufficient relationship between
the communication and the cause of action.'" Friedman v. Schwartz,
2009 WL 701111, at *6 (E.D.N.Y. Mar. 13, 2009) (quoting Sacody
Techs., Inc. v. Avant, Inc., 862 F. Supp. 1152, 1157 (S.D.N.Y.
1994)); see also Gulf Ins. Co., 417 F.3d at 357 ("Courts making
venue determinations in contract disputes have looked to such
factors as 'where the contract was negotiated or executed, where it
was to be performed, and where the alleged breach occurred.'"
(quoting Matera v. Native Eyewear, 355 F. Supp.2d 680, 686
(E.D.N.Y. 2005))).

9

Most of plaintiffs' allegations regarding their communications with defendants reference either faxes or e-mails between plaintiffs and one or more of the defendants, but do not specify whether those communications were sent from or received in the Southern District of New York.[3] (See, e.g., Compl. ¶¶ 20-45, 47-69). In an affidavit submitted with their opposition, however, plaintiffs clarify that "the negotiations regarding the transactions between the parties that are at issue in [this case] all . . . took place in Midtown Manhattan. . . ." (Aff. of Francis Smollon ("Smollon Aff.") ¶ 2). The affiant also states that he met with defendant Richmond several times in Manhattan during the course of those negotiations. (Id.).[4] The negotiations leading up to delivery of the $500,000.00 comprise a substantial portion of the acts giving rise to plaintiffs' claims, as they will likely provide key information in determining whether defendants wrongfully obtained those funds.

As for the actual delivery of the $500,000.00, plaintiffs state that they deposited those funds with defendant Brooks along

---

[3] The complaint alleges that a loan commitment was "transmitted through the wires" from Tennessee to New York, although it does not specify where in New York. (Compl. ¶ 26).

[4] The complaint also states that Richmond resides in Manhattan (Compl. ¶ 3), as does Smollon's affidavit in opposition to Plummer's motion. (Smollon Aff. ¶ 3).

with a signed loan agreement. (Compl. ¶ 24). While the complaint does not specify where plaintiffs made that deposit, it does allege that Brooks resides in the Southern District of New York (id. ¶ 5), and that Brooks and the other defendants held Brooks out as an attorney licensed to practice law in New York. (Id. ¶ 18).[5] From these allegations we can infer that plaintiffs transferred the $500,000.00 at issue to Brooks in the Southern District of New York.

Plaintiffs also allege that Brooks was to hold the escrow funds "until he received a commitment from the Swiss Shell, in the precise form of the commitment annexed to the escrow agreement." (Id. ¶ 24). Approximately two weeks after Brooks received the escrow funds from plaintiffs, Plummer, in the name of the Swiss Shell, provided Brooks with a commitment that did not match the commitment annexed to the escrow agreement. (Id. ¶ 25). This commitment was wired from Tennessee to New York. (Id. ¶ 26). In response, Brooks wired the $500,000.00 to Plummer in Tennessee. (Id. ¶ 27). Plaintiffs state in their opposition that Brooks sent these escrow funds from Manhattan. (Pls.' Mem. in Opp'n 9). The

---

[5] In addition, plaintiffs state in their opposition to Plummer's motion that they delivered the $500,000.00 "to Brooks' escrow account in Manhattan." (Pls.' Mem. in Opp'n 8) (emphasis added).

alleged communication that Plummer sent to New York that caused the subsequent funds transmittal additionally suffices to establish proper venue in this district. Cf. Cold Spring Harbor Lab., 762 F. Supp.2d at 555 ("[C]ourts have routinely held in the context of contract dispute cases that venue under § 1391(a)(2) 'may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action.'" (quoting Constitution Reins. Co. v. Stonewall Ins. Co., 872 F. Supp. 1247, 1249 (S.D.N.Y. 1995))).

In Plummer's motion he offers alternative appropriate venues for this matter. Plummer alleges that venue is proper "in New Jersey, where the events giving rise to the claim appear to have taken place, and in Pennsylvania or Delaware, where the Plaintiffs are located." (Def.'s Mot. Dismiss 23). While plaintiffs are located in Pennsylvania and Delaware (Compl. ¶¶ 1-2), this fact alone does not make venue appropriate in either state. The court must focus on the acts and omissions of defendants when examining whether venue in a forum is proper. See Prospect Capital Corp., 2009 WL 4907121, at *3 (citing Daniel, 428 F.3d at 432). Moreover, the only evidentiary support that Plummer provides for his assertion that the events giving rise to plaintiffs' claim took

place in New Jersey is that EPE's principal place of business is there. (Def.'s Mot. Dismiss 31). That plaintiff EPE's principal place of business is in New Jersey is not sufficient to find venue appropriate in New Jersey under section 1391(a)(2). Plaintiffs' locations in Delaware and Pennsylvania are also insufficient to demonstrate proper venue in those states under section 1391(a)(2).

Plummer then raises several objections to the Southern District of New York as a proper venue. He argues that plaintiffs' complaint asserts venue based solely on Brooks' residence and business presence as an escrow agent in New York. (Def.'s Mot. Dismiss 15-16, 19-20, 22-23). However, Plummer misconstrues plaintiffs' argument for proper venue in this district. Plaintiffs' venue choice is based not only on Brooks' residence, but also on the various acts giving rise to plaintiffs' claims, including Plummer's communications to the other defendants, which occurred in this district. (Compl. ¶¶ 25-26).

Similarly, Plummer contests plaintiffs' allegation that defendant Richmond is a resident of Manhattan. (Def.'s Mot. Dismiss 19, 22). He instead asserts that Richmond is a permanent resident

of Costa Rica.[6] (Id.). Because Richmond's place of residence is irrelevant to the venue inquiry under section 1391(a)(2), we disregard this contention. Plummer also asserts that plaintiffs' allegations that Richmond was acting as Plummer's agent are insufficient to demonstrate proper venue in this district. (Id. 24). Again, proper venue is not contingent upon Richmond's status as Plummer's agent, so this contention is irrelevant to our inquiry.

Finally, Plummer seeks to defeat venue by arguing that he alone cannot be subjected to venue in this district since he was never present in, and never transacted business in, this district. (Id. 20-21). In support of this argument, Plummer states that plaintiffs merely "speculate that it was Plummer who transmitted the commitment from [Tennessee] . . . [and] guess to what party in New York the commitment was transmitted." (Id. 21). Even if this contention were true, it is not sufficient to defeat venue. At this stage of the case, plaintiffs are required to make only "a prima facie showing of [venue]." Gulf Ins. Co., 417 F.3d at 355 (alteration in original) (quoting CutCo, 806 F.2d at 364-65).

---

[6] Plummer also asserts that Richmond was never served with the complaint in this action, which is contradicted by plaintiffs' affidavit of service upon Richmond (see Smollon Aff. Ex. B) and by Richmond's answer to the complaint.

Plaintiffs' assertion that Plummer transmitted a loan commitment into the Southern District of New York and, in so doing, caused the escrow funds to be transmitted from the Southern District to Plummer in Tennessee, is sufficient to make such a prima facie showing. Hence we recommend that Plummer's motion under Rule 12(b)(3) be denied.[7] We now turn to his other contentions.

## B. The Allegedly Controlling Arbitration Clause

Plummer and plaintiffs both allege that this action arises out of a contract between plaintiff EPE and non-party CASA. (Def.'s Mot. Dismiss 34-35) (citing Compl. ¶ 22). Plummer also contends that this contract contains a mandatory arbitration clause, which requires all claims arising under it to be arbitrated in Switzerland. (Id. at 34-36). Plummer asks that we compel arbitration under this provision. (Id.).

The Federal Arbitration Act ("FAA") is "an expression of a strong federal policy favoring arbitration as an alternative means of dispute resolution." JLM Indus., Inc. v. Stolt-Nielsen SA, 387

---

[7] Plummer also requests an evidentiary hearing on venue. (Def.'s Mot. Dismiss 32-35). Since we see no reason why such a hearing would be necessary to resolve issues of fact regarding venue, we recommend that this request be denied.

F.3d 163, 171 (2d Cir. 2004) (citation omitted) (internal quotation marks omitted). Under the FAA, a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Moreover,

> If any suit or proceeding be brought in [federal court] upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3. Although section 3 of the FAA requires courts to stay actions that are subject to arbitration, "courts have the discretion to dismiss – rather than stay – an action when all of the issues in it must be arbitrated." Milgrim v. Backroads, Inc., 142 F. Supp.2d 471, 476 (S.D.N.Y. 2001).

When deciding a motion to compel arbitration, a court must address four issues: "(1) whether the parties agreed to arbitrate; (2) the scope of the agreement to arbitrate; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, of the claims are arbitrable, whether to stay the balance of the

16

proceedings pending arbitration." <u>Rodriguez v. Four Seasons Hotels,</u>
<u>Ltd.</u>, 2009 WL 2001328, at *3 (S.D.N.Y. July 10, 2009) (citing <u>JLM</u>
<u>Indus., Inc.</u>, 387 F.3d at 169); <u>accord</u> <u>Oldroyd v. Elmira Sav. Bank,</u>
<u>FSB</u>, 134 F.3d 72, 75-76 (2d Cir. 1998); <u>Genesco, Inc. v. T.</u>
<u>Kakiuchi & Co.</u>, 815 F.2d 840, 844 (2d Cir. 1987). Since, however,
"arbitration 'is a matter of consent, not coercion,' . . . 'a party
cannot be required to submit to arbitration any disputes which [it]
has not agreed so to submit.'" <u>Butto v. Collecto, Inc.</u>, __ F.
Supp.2d __, 2011 WL 3557310, at *2 (E.D.N.Y. Aug. 15, 2011)
(quoting <u>Ross v. Am. Express Co.</u>, 547 F.3d 137, 143 (2d Cir. 2008);
<u>Republic of Ecuador v. Chevron Corp.</u>, 638 F.3d 384, 392 (2d Cir.
2011)). Hence "'[t]he party seeking to compel arbitration has the
burden of demonstrating by a preponderance of the evidence the
existence of an agreement to arbitrate.'" <u>Id.</u> (quoting <u>Tellium,</u>
<u>Inc. v. Corning Inc.</u>, 2004 WL 307238, at *5 (S.D.N.Y. 2004)).

Plummer fails to demonstrate the existence of such an
agreement. As Plummer asserts, the complaint references a "proposed
loan agreement," at least two drafts of which defendants provided
to plaintiffs. (Compl. ¶¶ 22-23). The complaint also alleges that
plaintiffs signed a loan agreement on May 14, 2010, prior to
depositing $500,000.00 with Brooks. (<u>Id.</u> ¶ 24). Plaintiffs did not
attach a copy of this loan agreement to their complaint, but

17

Plummer attached what he contends is the agreement as an appendix
to his motion to dismiss. (See Def.'s Mot. Dismiss, "Loan
Agreement"). Sabilia (on behalf of EPE) is the only party who
signed the attached agreement. (Id. at 5). Hence it is not clear
that the contract that Plummer cites was ever fully executed. It
follows that he has not demonstrated that the parties to this
lawsuit agreed to arbitrate under that contract.

For these reasons, Plummer's request to compel arbitration
fails at the first step. We note also that the parties to the
purported contract were to have been EPE and CASA. However, the
signature lines on the contract's signature page only name Sabilia
on behalf of EPE and Richmond as an officer of CASA. (Id.). Neither
Plummer nor CDT is identified as a party to the contract, nor is
Plummer listed as a signatory. (Id.). Thus, even if the contract
had been fully executed and binding as to arbitration, it is not
clear that plaintiffs and Plummer would have been bound to
arbitration under the agreement. It is also not clear that Plummer
would have the right to enforce the contract's arbitration clause
in his individual capacity, as non-signatories to arbitration
agreements may only enforce such agreements in certain situations.
See, e.g., Butto, 2011 WL 3557310, at *2 (quoting Smith/Enron
Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l,

18

Inc., 198 F.3d 88, 97 (2d Cir. 1999)) (stating that non-signatories to arbitration agreements may have the right to enforce such agreements under certain theories, including incorporation by reference, assumption, agency, and estoppel). Plummer has not provided sufficient evidence -- or any evidence -- to demonstrate that this case presents such an exceptional circumstance. We therefore recommend that Plummer's motion to compel arbitration be denied. Next we address Plummer's contentions regarding compulsory joinder.

### C. Joinder of Indispensable Parties - Rules 12(b)(7) and 19

Plummer asserts that CDT "is an indispensable party that must be joined in order to meaningfully litigate the breach of contract and contract-based counts of the Complaint." (Def.'s Mot. Dismiss 60). Plummer's initial assertion that non-joinder of CDT requires dismissal appears limited to plaintiffs' contract-based claims. (Id.). However, Plummer later asserts that we "must find that CDT is indispensable to this action if any claims alleged in the amended Complaint remain in the case." (Id. at 63). In keeping with our obligation to read pro se parties' submissions to raise the strongest arguments suggested, see, e.g., United States v. Karron, 750 F. Supp.2d 480, 489 n.7 (S.D.N.Y. 2011) (quoting Soto v.

19

<u>Walker</u>, 44 F.3d 169, 173 (2d Cir. 1995)), we will examine Plummer's compulsory-joinder arguments as though he had asserted them against all of plaintiffs' allegations.

Rule 19 addresses the compulsory joinder of indispensable parties. <u>Klockner Stadler Hurter Ltd. v. Ins. Co. of Pa.</u>, 785 F. Supp. 1130, 1132 (S.D.N.Y. 1990). The Rule itself provides that

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). If a person described in Rule 19(a)(1) cannot be made a party for reasons such as lack of jurisdiction or improper venue, we "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b); 59 Am. Jur. 2d <u>Parties</u> § 134 (2011). However, "[u]nless Rule 19(a)'s threshold standard is met, [we] need not consider whether dismissal under Rule 19(b) is warranted." <u>Associated Dry Goods Corp. v. Tower Fin. Corp.</u>, 920

F.2d 1121, 1123 (2d Cir. 1990).

Assuming for purposes of this motion that CDT is able to be joined in the present action, we consider whether CDT is an indispensable party pursuant to Rule 19(a). In doing so, we "must base [our] decision on the pleadings as they appear at the time of the proposed joinder." Id. at 1124 (quoting 7 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1604, at 40 (2d ed. 1986)). Hence we decline Plummer's invitation to hold an evidentiary hearing on this matter (see Def.'s Mot. Dismiss 60) and address the requirements of Rule 19(a).

Rule 19(a)(1)(A) requires us to examine whether the court could accord complete relief to the existing parties. Plummer asserts, in conclusory fashion, that we cannot do so "[i]f CDT has a clear interest in the CASA-EPE contract." (Id. at 63). Plummer not only fails to show the existence of such a contract, but also fails to explain why CDT's interest in the contract would prevent the resolution of plaintiffs' claims against Plummer and the other defendants. CDT's presence is not required to determine whether Plummer and the other remaining defendants are liable to plaintiffs. Cf. Klockner Stadler Hurter Ltd., 785 F. Supp. at 1132 (finding presence in suit of insurance company and construction

company unnecessary under Rule 19 to resolve claims justly against other defendant insurance companies). Hence we turn to Rule 19(a)(1)(B), under which we consider whether CDT "claims an interest relating to the subject of the action" and whether non-joinder of CDT would "impair or impede [CDT's] ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B).

Plummer first asserts that CDT must be joined in the present action, or it could be subject to "negative precedent" and "the consequences of collateral estoppel without the ability to protect its interests in the litigation." (Def.'s Mot. Dismiss 60). He also asserts that CDT might be subject to inconsistent judgements if Plummer, but not it, is part of the current proceeding. (Id. 62-63).

These contentions are irrelevant to Rule 19(a)(1)(B)(ii), which is concerned with subjecting existing parties to multiple or inconsistent judgments. As CDT is not a party, there is no such risk in this case.

We also read Plummer's papers to raise the issue of CDT's

22

alleged interest in the purported contract between EPE and CASA
(Def.'s Mot. Dismiss 63), but without any explanation of what that
interest might be (or, indeed, any evidence that the purported
contract ever took effect), we cannot say that this supposed
interest would be impaired or impeded.

Finally, we consider Plummer's assertion that because
"[p]laintiffs allegedly did business with CDT but name Tom C.
Plummer [as a defendant] without piercing the corporate veil," CDT
might have some interest in maintaining its corporate formalities,
which interest might be impaired if CDT were not named as a party.
(Id. 62). Again, there is no merit to this contention. Individual
defendants are capable of raising a veil-piercing defense on their
own behalf. See, e.g., Panam Mgmt. Grp., Inc. v. Pena, 2011 WL
3423338, at *1-2 (E.D.N.Y. Aug. 4, 2011) (considering and granting
individual defendants' motion to dismiss on the basis that
corporate defendant's veil could not be pierced). Were this not so,
any plaintiff could circumvent the corporate veil simply by
refusing to name the pertinent corporation as a defendant.

We find Plummer's contention that we must dismiss this case
for failure to join an indispensable party to be without merit. We
therefore move on to Plummer's contention that plaintiffs failed to

23

state any valid claim for relief. We begin by stating the Rule 12(b)(6) standards under which we examine motions to dismiss for failure to state a claim, and then analyze Plummer's arguments as to each of plaintiffs' claims in turn.

D. Rule 12(b)(6) Criteria

On a motion to dismiss for failure to state a claim, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord, e.g., Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006) (internal citation omitted). In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. E.g., Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006); Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). The pleader may not rely, however, on allegations that are only bare legal conclusions, see Starr v. Sony BMG Music Entm't, 592 F.3d 314, 317 n.1 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009)) (discussing Rule 8(a)), or "legal conclusions couched as factual

24

allegations". <u>Starr</u>, 592 F.3d at 321 (quoting <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007)).


The traditional test on a Rule 12(b)(6) motion required that the complaint not be dismissed "unless it appear[ed] beyond doubt that the plaintiff [could] prove no set of facts in support of his claim which would entitle him to relief." <u>Leibowitz v. Cornell Univ.</u>, 445 F.3d 586, 590 (2d Cir. 2006) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). The Supreme Court has since rejected this formulation, however, and a complaint is now subject to dismissal unless its well-pled factual allegations, if credited, make the claim "plausible." <u>See</u> <u>Iqbal</u>, 129 S. Ct. at 1949; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 560-61 (2007). While the Supreme Court's recent decisions do not require a party to plead "detailed factual allegations" to survive a motion to dismiss, they do require that the plaintiff plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 129 S. Ct. at 1949). In any event, "an unadorned, the-defendant-unlawfully-harmed-me accusation" will not suffice. <u>Iqbal</u>, 129 S. Ct. at 1949. In short, the pleading must do more than put forth "naked assertions devoid of further factual enhancement," <u>id.</u> (internal quotation marks omitted) (citing <u>Twombly</u>, 550 U.S. at

25

557), and in doing so must "'raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555). Dismissal is appropriate "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . ." Starr, 592 F.3d at 321 (citing Iqbal, 129 S. Ct. at 1950).

When addressing a 12(b)(6) motion, the court may not consider evidence proffered by the moving party or its opponent. E.g., Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Healthcare Fin. Grp., Inc. v. Bank Leumi USA, 669 F. Supp. 2d 344, 347 (S.D.N.Y. 2009) (internal citation omitted). Rather, the court is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. See, e.g., ATSI Commc'ns, Inc., 493 F.3d at 98; Roth, 489 F.3d at 509; Leonard F. v. Israel Disc. Bank, 199 F.3d 99, 107 (2d Cir. 1999).

In Plummer's motion to dismiss, he asserts that plaintiffs

failed to state any viable claims,[8] and he proceeds to attack the
sufficiency of the pleadings for each of plaintiffs' claims.[9]
Plummer also asserts that plaintiffs failed to adequately allege an
agency relationship between him and Richmond and failed to assert
a veil-piercing claim, and that each of these defects merits
dismissal. We analyze plaintiff's assertions under the Rule
12(b)(6) rubric, beginning with his contentions regarding agency,
then addressing plaintiff's individual claims, and finally turning
to veil-piercing.[10]

---

[8] Since our subject-matter jurisdiction is based on
diversity, we would ordinarily apply the choice-of-law rules of
the forum state, New York, in determining which state's law to
apply to the question of whether plaintiffs have stated a valid
claim for relief. See, e.g., Amusement Indus., Inc. v. Stern, 693
F. Supp.2d 327, 338 (S.D.N.Y. 2010). Here, however, no party
briefed the choice-of-law question, and both Plummer and
plaintiffs refer exclusively to New York law when discussing
Plummer's 12(b)(6) motion. Hence "we deem the parties to have
implicitly consented to having New York law apply, and this
'implied consent . . . is sufficient to establish choice of law'
on the question." Id. at 341-42 (quoting Krumme v. WestPoint
Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)).

[9] Plummer also attacks plaintiffs' complaint generally,
asserting that the complaint's reference to "Plaintiff" rather
than "Plaintiff EPE [] by and through agent Sabilia" renders the
complaint fatally defective. (Def.'s Mot. Dismiss 37). Plummer
not only fails to point to any part of the complaint that refers
to an individual plaintiff rather than both plaintiffs, but also
fails to point to any legal support for his contention that
"[t]his missing language . . . mak[es] dismissal on Rule 12(b)(6)
grounds appropriate." (Id. 37). Hence we will ignore this
frivolous argument.

[10] Plummer also asserts that plaintiffs failed to plead fraud
with the specificity required by Rule 9. (Def.'s Mot. Dismiss 36-

27

E. Agency

Plummer initially challenges plaintiffs' lawsuit by asserting that it must fail if plaintiffs cannot allege that defendant Richmond was acting as Plummer's agent during the events alleged in the complaint. (Def.'s Mot. Dismiss 8-13; 31-32). He asserts that plaintiffs failed to plead a factual basis for the three elements of agency as defined under federal law, and instead relied only on "a mere presumption of agency as the basis for" their claims of "[f]raud, [e]stoppel, [n]egligent [m]isrepresentation and [c]onspiracy." (Id. 10).

"Under New York law, '[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act.'" Amusement Indus., 693 F. Supp.2d at 343 (alteration in original) (quoting In re Shulman Transp. Enters., Inc., 744 F.2d 293, 295 (2d Cir. 1984)). "An agency relationship is generally created by 'written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires

45). We analyze this argument in a separate section below.

him so to act on the principal's account.'" <u>Id.</u> (quoting <u>Nationwide</u>
<u>Life Ins. Co. v. Hearst/ABC-Viacom Entm't Servs.</u>, 1996 WL 263008,
at *7 (S.D.N.Y. May 17, 1996)). Once an agency relationship is
established, the principal is liable to third parties for any acts
the agent takes "within the scope of the agent's actual or apparent
authority." <u>Id.</u>

   "Actual authority is bestowed upon an agent 'by direct
manifestations from the principal to the agent. . . .'" <u>Id.</u>
(quoting <u>Peltz v. SHB Commodities, Inc.</u>, 115 F.3d 1082, 1088 (2d
Cir. 1997)). "The extent of the agent's actual authority is
interpreted in light of all circumstances attending these
manifestations . . . ." (<u>Id.</u>) (quoting same). Apparent authority,
on the other hand, is created by "words or conduct of the
principal, communicated to a third party, that give rise to the
appearance and belief that the agent possesses authority to enter
into a transaction." <u>Standard Funding Corp. v. Lewitt</u>, 89 N.Y.2d
546, 551, 656 N.Y.S.2d 188, 191 (1997) (quoting <u>Hallock v. New</u>
<u>York</u>, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513 (1984)). "In such
circumstances, the third party's reasonable reliance upon the
appearance of authority binds the principal." <u>Id.</u> (citing <u>Hallock</u>,
64 N.Y.2d at 231, 485 N.Y.S.2d at 513).

Plummer states that plaintiffs rely on a presumption of agency rather than specific allegations. (Def.'s Mot. Dismiss 10). This argument both misconstrues plaintiffs' burden at the pleading stage and ignores the relevant allegations in plaintiffs' complaint. However, we also cannot agree with plaintiffs' contention that "at the pleading stage, '[c]onclusory allegations are sufficient to establish agency.'" (Pls.' Mem. in Opp'n 14 (quoting Commercial Fin., Inc. v. Great Am. Ins. Co. of N.Y., 381 F. Supp.2d 291, 302 (S.D.N.Y. 2005)). Pursuant to Iqbal's rule that we need not accept as true "a legal conclusion couched as a factual allegation," 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555), a simple conclusory allegation to the effect that "defendant A acted as defendant B's agent," without more, would not plausibly state an agency relationship. Thus, if an agency relationship were a prerequisite for recovery, such a conclusory allegation would not state a valid claim for relief. We therefore analyze the parties' contentions on agency by reference to the rule "that to survive a motion to dismiss under 12(b)(6) on this issue, a plaintiff need only 'raise[] a sufficient inference that some sort of agency relationship existed between' the purported principal and agent." Amusement Indus., 693 F. Supp.2d at 344 (quoting Commercial Fin. Servs., Inc., 381 F. Supp.2d at 302). Furthermore, "New York courts have stated broadly that [w]here the circumstances alleged in the

pleading raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency are issues for the jury." Id. (quoting Maurillo v. Park Slope U-Haul, 194 A.D.2d 142, 147, 606 N.Y.S.2d 243, 247 (2d Dep't 1993)) (internal quotation marks omitted).

In this case, plaintiffs' allegations that Richmond acted as Plummer's agent during the events that led to plaintiffs' injury are more than "unadorned" accusations. Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555). Plaintiffs specifically allege that Richmond took several actions "on behalf of Plummer" or "on behalf of the other defendants" throughout the relevant time period. (See, e.g., Compl. ¶¶ 23, 30-33, 37, 39-43, 45, 51-54, 56-66). Even if we were to discredit plaintiffs' allegations to this effect where plaintiffs provide no additional factual support, several allegations remain that tend to show an agency relationship between Richmond and Plummer.

First, plaintiffs allege that Richmond "relayed what purported to be requests for information by Plummer that was [sic] required to obtain funding for the loan to plaintiffs." (Id. ¶ 43). Next they allege that on October 18, 2010, Plummer wrote a letter

31

acknowledging receipt of plaintiffs' escrow funds and promising to
issue the loan funds on this basis. (Id. ¶ 48). Plummer allegedly
sent this letter "to Richmond . . . to be forwarded to plaintiffs
. . . using the Swiss Shell's letterhead and a date in European
fashion." (Id.). In the letter, "Plummer misrepresented to the
plaintiffs that the financing would be forthcoming." (Id. ¶ 49).


    Perhaps most crucially, plaintiffs allege that, in an e-mail
to plaintiffs the following day, Plummer stated that "all
communications should go through Richmond . . . ." (Id. ¶ 50).
Plummer attempts to thwart the obvious implication of this e-mail
-- that he was directing plaintiffs to communicate only with his
agent, Richmond -- by stating that his e-mail was in response to an
e-mail and telephone call from plaintiffs. (Def.'s Mot. Dismiss 10-
11). He also suggests that his e-mail was ambiguous, and could
simply reflect "an employee directing a client or co-worker to
another individual. . . ." (Id. at 12). Both of these contentions
ignore our duty on a motion to dismiss to draw all reasonable
inferences against the movant. See, e.g., Achtman, 464 F.3d at 337.
Given that duty, the most reasonable inference in this situation is
that Plummer, as principal, directed plaintiffs to communicate
solely with Richmond, his agent, for two reasons: (1) because he
wished to inform plaintiffs that Richmond was acting as his agent;

and (2) because further direct communications with a disclosed principal could confuse the relationship.[11] Finally, Plummer asserts that "none of the allegations permits one to draw a reasonable inference that either Defendant Richmond acknowledged Plummer's control of the processes of the underlying events described in the Complaint, or that Defendant Plummer ever acknowledged such control by Richmond." (Def.'s Mot. Dismiss 12). However, plaintiffs are not required to allege the agent's acknowledgment or understanding of

---

[11] This inference is particularly reasonable given Plummer's other allegation regarding his contact with plaintiffs: that his e-mail directing them to contact Richmond reminded them that their direct contact with him was "in breach of a provision in the contract between Plaintiff EPE and Defendant Richmond's company, CASA specifically barring direct communications between Plaintiffs and Defendant Plummer [Plummer's company CDT]." (Def.'s Mot. Dismiss 11) (alteration in original). We take this contention to refer to section 35.0 of the purported agreement between EPE and CASA, attached as an exhibit to Plummer's motion to dismiss. (Id., Loan Agreement, 5). This provision prohibits EPE and others connected to it from communicating with various entities (other than CASA) which were, in theory, to provide loan funds to EPE. (Id.). Plummer makes much of this contract (even though it remains unclear if it was ever executed), but he fails to explain why the contract between plaintiffs and Richmond would even refer to Plummer or his company if he were not somehow involved in the transaction, either as Richmond's principal, or, as plaintiffs quite plausibly allege, as a partner in a fraudulent scheme. Moreover, the same section of the purported contract states that any violation of the "do-not-contact" provision "will result in the immediate cancellation of this AGREEMENT with no liability ensuing to CASA." (Id.). Hence, even if the contract had been effective, it would have terminated upon plaintiffs' contact with Plummer. Therefore, Plummer's subsequent actions could have led to his liability regardless of the existence of an agency relationship with Richmond.

the principal's control over the transaction at issue to bind the principal for the agent's alleged <u>apparent</u> authority. Furthermore, plaintiffs do allege that Plummer acknowledged his role as principal in the October 19, 2010 e-mail he sent to plaintiffs directing all communication to go through Richmond. (Compl. ¶ 50).

Plaintiffs' allegations are certainly sufficient at this stage to give rise to an inference of reasonable reliance upon Richmond's apparent authority to act as Plummer's agent in the relevant transactions. Moreover, the agency relationship between Richmond and Plummer is not plaintiffs' sole basis for asserting Plummer's liability.

In addition to the agency-based allegations recited above, plaintiffs allege that Plummer himself made numerous false statements upon which they reasonably relied. For example, plaintiffs allege that Plummer (1) "represented to plaintiffs . . . that he would provide a €35 million demand guarantee" in exchange for their escrowed $500,000.00 (Compl. ¶ 21); (2) may have drafted a loan agreement outlining the terms for such a transaction (<u>id.</u> ¶ 23); and (3) "provided a [loan] commitment in the name of the Swiss Shell" that he sent to Brooks in order to obtain plaintiffs' escrowed funds. (<u>Id.</u> ¶¶ 25-26). Moreover, plaintiffs allege that

34

Plummer "falsely advised [them] that the $500,000.00 [in] escrow was intact and would be returned to plaintiffs upon demand" at a time when the escrow funds had allegedly already been dissipated. (Id. ¶¶ 43-45). Plaintiffs also allege that Plummer "admitted that he made a number of mistakes that prevented the loan from being funded but continued to promise that the loan would be funded, when he had no ability or desire to do so, and made such representations with the intent that plaintiffs would be delayed in asserting their rights." (Id. ¶ 69). Finally, over several months, Plummer and Richmond "repeatedly promised to reimburse plaintiffs for the escrow that they had converted." (Id. ¶ 70).

These allegations suffice to support plaintiffs' claims against Plummer at this stage of the case even if they had failed to plead a plausible agency relationship between Plummer and Richmond.

F. Fraud

Under New York law, a plaintiff asserting common-law fraud must allege that "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and

35

justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss." Amusement Indus., 693 F. Supp.2d at 347 (citing Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 488, 836 N.Y.S.2d 509, 515 (2007)).

Plummer not only asserts that plaintiffs failed to state a claim for fraud under Rule 12(b)(6), but also moves to dismiss plaintiffs' fraud claim for failure to comply with the heightened pleading standard set forth in Rule 9(b).[12] We briefly review the requirements of Rule 9(b), and then address Plummer's arguments on plaintiffs' fraud claim.

### 1. Rule 9(b) Criteria

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud [while] . . .

---

[12] Plummer also argues that plaintiffs' fraud claims do not meet the notice pleading requirements of Rule 8(a), asserting in conclusory fashion that "defendants have been left to guess what they have been personally accused of doing and saying, with and to whom and pursuant to what written agreement." (Def.'s Mot. Dismiss 24-25). Given the extensive factual allegations in the complaint and the various legal theories attributed to defendants' alleged wrongdoing, we consider this argument frivolous.

[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127-28 (2d Cir. 1994); Granite Partners, L.P. v. Bear Stearns & Co., Inc., 17 F. Supp.2d 275, 286 (S.D.N.Y. 1998). To comply with this requirement, the complaint "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc., 493 F.3d at 99; accord Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). Though "the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great specificity. . . ," Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996), courts advise plaintiffs not to "mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) (internal quotations omitted). The complaint must therefore allege facts that give rise to a "strong inference of fraudulent intent," which may be established "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner, 459 F.3d at 290-91 (quoting

37

<u>Shields</u>, 25 F.3d at 1128).

### 2. The Allegedly Fraudulent Statements

The complaint makes several allegations regarding defendants'
allegedly fraudulent statements, all of which are intended to
create a single narrative: defendants colluded to deceive
plaintiffs into believing that defendants represented entities
capable of funding a €35 million loan in exchange for $500,000.00
from plaintiffs. Once plaintiffs deposited those funds into escrow,
defendants misappropriated those funds while continuing to assure
plaintiffs that the loan was forthcoming. Defendants allegedly made
these assurances in order to prevent plaintiffs from seeking the
return of the escrowed funds before defendants could dissipate
them. Plaintiffs' specific fraud allegations are as follows:

1. Richmond and Plummer purported to represent foreign
business organizations, CASA and CDT, which were later revealed to
be shell corporations. (Compl. ¶¶ 14-15).

2. Defendants represented to plaintiffs that if plaintiffs
provided $500,000.00, defendants "would, in return, provide a loan
to the plaintiffs of €35 million, along with collateral for that

loan." (Id. ¶ 16). However, plaintiffs "never had any ability to deliver a €35-million loan to the plaintiffs and . . . defraud[ed] plaintiffs into delivering to Brooks $500,000.00 for the purpose of obtaining a secured loan that defendants had no intention of providing to plaintiffs." (Id. ¶ 19).

3. Plummer represented to plaintiffs "that he would provide a €35 million demand guarantee in the form of 'liquid reserves and fungible (cash equivalent) securities.'" (Id. ¶ 21).[13]

4. On May 19, 2010, Charles provided plaintiffs with a proposed loan agreement. The agreement called for plaintiffs to deposit $500,000.00 in exchange for which CDT would provide €30 million in collateral to secure a €35 million loan from CASA. (Id. ¶ 22). Richmond provided another draft of the loan agreement on May 21, 2010. (Id. ¶ 23). This draft was, according to plaintiffs, made to appear as if it had been drafted in Europe when it was actually drafted in the United States by either Richmond or Plummer. (Id.).

5. After plaintiffs deposited $500,000.00 with Brooks, Brooks

---

[13] Although plaintiffs do not specify a date on which this representation was made, Plummer has admitted to making it. (Def.'s Am. Answer ¶ 21).

agreed to hold the funds in escrow until he received a loan commitment from CDT that conformed with the commitment annexed to the escrow agreement. (Id. ¶ 24).

6. On June 2, 2010, Plummer provided Brooks with a loan commitment that did not conform to the one annexed to the escrow agreement. (Id. ¶ 25). Plaintiffs allege that this commitment "contained promises and commitments that the defendants had no intention or ability to keep." (Id. ¶ 26).[14]

7. Over the following months, Richmond made several allegedly false statements that plaintiffs contend were designed to delay plaintiffs' assertion of their rights to the allegedly misappropriated escrowed funds. Richmond's statements included:

- a June 16, 2010 e-mail stating that the loan commitment would need to be redacted (id. ¶ 28);

- a June 18, 2010 e-mail misrepresenting the reasons why

_____

[14] As stated above, plaintiffs allege that Brooks sent the $500,000.00 to Plummer after receiving this commitment. (Compl. ¶ 27). Plummer admits this allegation. (Def.'s Am. Answer ¶¶ 27 ("Defendant Plummer admits the receipt of funds occurred . . . ."), 37 ("the $500,000.00 escrow had already been sent to Plummer in Tennessee")).

defendants had not yet provided plaintiffs with the promised loan funds (id. ¶ 29);

- a June 22, 2010 e-mail stating that defendants needed to amend the loan agreement (id. ¶ 30);

- a representation made on or around June 24, 2010 that the loan would be funded by the first week of August (id. ¶ 31);

- one or more e-mails dated July 13, 2010 stating that loan funding would be provided within days from either a Dubai or a Hong Kong bank, and that the only reason it had not been provided already was that the defendants' banker in Hong Kong was out of the office due to his father's emergency surgery (id. ¶¶ 32-33);

- an e-mail dated August 26, 2010, representing that Richmond was "in the process of 'lining up and coordinating the issuance of a guarantee and related loan facility,' even though he had no ability, intent or desire to perform such obligations," and that Richmond would personally travel to Hong Kong to supervise the closing (id. ¶ 38);

- an e-mail dated September 1, 2010 stating that "banks have

41

agreed to the verbiage of the respective doc[ument]s" although "there were no banks involved that had any desire or ability to provide the funding" (id. ¶ 39);

- an e-mail dated September 17, 2010, in which Richmond stated, "we are still on track for the issuance of the [loan] guarantee and I will keep you posted," and further represented that he would provide Sabilia with interim funds so that he could avoid losing his home to foreclosure (id. ¶ 40);

- an e-mail dated September 30, 2010, representing that Richmond was in communication with a bank in Hong Kong, which had advised Richmond that funding would take place by the end of the following week, although neither "Richmond nor Plummer were in contact with any lenders who could or had any desire to provide such funding" (id. ¶ 41);

- an e-mail dated October 10, 2010, stating that CASA was prepared to fund the €35 million loan or refund the escrow, though CASA had no ability to fund any loan, and defendants were already spending the escrowed funds (id. ¶ 42);

- an e-mail dated October 16, 2010, relaying "what was

purported to be requests for information by Plummer that was required to obtain funding for the loan to plaintiffs, even though Plummer . . . had no ability or intention of providing any collateral or funding of the loan" (id. ¶ 43);

    - a statement in mid-October 2010 that the escrowed funds were intact and could be returned to plaintiffs upon demand (id. ¶ 44); and

    - a statement in a telephone conversation on October 13, 2010, during which Richmond advised plaintiffs that the $500,000.00 escrow would be returned within a week to ten days. (Id. ¶ 45).

    8. On October 18, 2010, Plummer sent Richmond a letter. (Id. ¶ 48). This letter, which was on CDT's letterhead and used a European-style date, acknowledged receipt of $495,000.00 of plaintiffs' escrowed funds, stated that the funds were applicable to the provision of collateral for the loan, apologized for the delay in providing the collateral, and promised that defendants would provide the collateral by November 15, 2010 "even though [Plummer] had no intention or ability of doing so [sic]." (Id.). Plaintiffs claim that this letter was designed to be forwarded to them (id.), and it apparently was.

43

9. On October 21, 2010, Richmond sent one or more e-mails stating that CDT's loan guarantees were forthcoming, that he was dealing with two European banks, Credit Suisse and Commerzbank, that a bank in Hong Kong would authenticate and fund the loan and guarantee within seven days, that the initial loan disbursements would be made to EPE by November 15, 2010, and that CASA would refund plaintiffs' $500,000.00 as soon as possible upon plaintiffs' request. (Id. ¶¶ 51-54, 56).

10. Around the same time, defendants provided plaintiffs with a disbursement schedule for €27,750,000 of the purported loan. (Id. ¶ 55).

11. Over the following month, Richmond sent several e-mails, each reassuring the plaintiffs that the loan funds would soon be provided and/or that plaintiffs' escrowed funds would shortly be returned, plus interest. (Id. ¶¶ 57-63)

12. On November 15, 2010 -- the date by which Richmond repeatedly assured plaintiffs that they would receive their loan -- Plummer sent another letter to Richmond on CDT's letterhead, stating that additional requirements had to be met prior to providing the loan commitment. (Id. ¶ 64). These requirements

differed from those contained in the initial June 2, 2010 commitment letter, and from the commitment annexed to the escrow agreement. (Id.). Plummer allegedly sent this letter to Richmond with the intent that it would be forwarded to plaintiffs. (Id. ¶ 65). The letter also contained statements that CDT would provide collateral "to enable the funding of a credit facility by December 5, 2010 and that the financing [would] proceed over a period of 12 months, starting as early as November 19, 2010 . . . ." (Id.). Plaintiffs again allege that "defendants had no ability to comply with the foregoing representations, defendants' representations were false and were designed to induce reliance on the part of plaintiffs." (Id.).

13. In an e-mail dated November 20, 2010, Richmond represented that the guarantee that Plummer had provided plaintiffs had been increased, which had delayed the delivery of the loan funding by Barclays Bank. (Id. ¶ 66).

14. On December 1, 2010, Plummer advised plaintiff Sabilia's brother "that the financing package would be completed by December 3, 2010 at the latest, even though defendants had no ability to deliver on the foregoing promise or intention to do so." (Id. ¶ 67).

45

15. On December 6, 2010, Plummer sent one or more e-mails to plaintiffs requesting additional information in connection with the loan, which plaintiffs had already provided, and "admitt[ing] that he made a number of mistakes that prevented the loan from being funded but continu[ing] to promise that the loan would be funded, when he had no ability or desire to do so, and made such representations with the intent that plaintiffs would be delayed in asserting their rights." (Id. ¶¶ 68-69).

### 3. Analysis

In sum, plaintiffs state that, prior to delivery of the $500,000.00, defendants misrepresented both the existence of CASA and CDT as legitimate business entities and those entities' ability to obtain loan guarantees and provide financing. After the $500,000.00 escrow was delivered to Plummer, he and Richmond repeatedly and falsely averred that the loan funds were imminently forthcoming in order to delay plaintiffs' efforts to procure the return of their funds. Plaintiffs allege that they reasonably relied upon these misrepresentations by defendants to their detriment. (Id. ¶¶ 73-80).

Plummer raises several issues with plaintiffs' litany of

46

allegedly misleading statements. First, he states that plaintiffs failed to comply with Rule 9 because they failed to state which of the defendants made which of the misleading statements. (Def.'s Mot. Dismiss 39) (citing <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993)). A cursory glance at the complaint shows that the vast majority of plaintiffs' allegations regarding defendants' specific misrepresentations state precisely which defendant said what, and when. (<u>See</u> <u>generally</u> Compl. ¶¶ 21-23, 28-71). Hence, this argument must fail.

Plummer's only other argument that directly addresses the adequacy of plaintiffs' fraud claim is his conclusory statement that plaintiffs did not plead sufficient facts to make out a viable claim for fraud. (Def.'s Mot. Dismiss 39). On the contrary, plaintiffs specifically alleged numerous misrepresentations by the defendants, including Plummer, that were intended to induce plaintiffs to place $500,000.00 in escrow with defendants and delay in seeking its recovery, even though defendants lacked the intent and ability to provide plaintiffs with the promised loan. With only a handful of immaterial exceptions, each allegation in the complaint "(1) specif[ies] the statements that the plaintiff[s] contend[] were fraudulent, (2) identifies the speaker, (3) state[s] where and when the statements were made, and (4) explain[s] why the

47

statements were fraudulent." Amusement Indus., 693 F. Supp.2d at 349 (citing Lerner, 459 F.3d at 290). Thus, plaintiffs adequately state the circumstances constituting fraud with particularity, as required under Rule 9(b).

We briefly address Plummer's contention that plaintiffs cannot make out a fraud claim against him without a viable allegation that Richmond was his agent. (Def.'s Mot. Dismiss 43). The short answer is that we have already determined that plaintiffs adequately alleged a principal/agent relationship between Plummer and Richmond, and therefore Plummer's argument on this point fails. However, even if Richmond had not been acting as Plummer's agent, Plummer acknowledges telling plaintiffs that he would provide a €35 million demand guarantee in the form of "liquid reserves and fungible (cash equivalent) securities." (Def.'s Am. Answer ¶ 21). This admission, coupled with plaintiffs' allegations that Plummer operated a shell corporation for the purpose of defrauding plaintiffs (Compl. ¶ 15) and that Plummer never had any ability to deliver loan funding (id. ¶ 19), is sufficient at this stage to make out a fraud claim against Plummer. Plaintiffs have adequately alleged that Plummer made material misrepresentations of fact upon which they justifiably relied to their detriment.

Before moving on to the remaining causes of action, we address other potential arguments that the pro se defendant could assert to show that plaintiffs failed to state a claim for fraud. Reading Plummer's papers to raise the strongest suggested arguments, we note that several of the alleged misrepresentations concern defendants' intent or ability to provide loan funding. (See, e.g., Compl. ¶¶ 19, 22, 26, 39, 42-43, 48-49, 54-59, 65, 67-69). "'A failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promise at the time it is made.'" Amusement Indus., 693 F. Supp.2d at 351 (quoting Murray v. Xerox Corp., 811 F.2d 118, 121 (2d Cir. 1987)).

The complaint repeatedly states, with regard to defendants' promises of future performance, that defendants had neither the intent nor the capacity to fulfill their promises at the times they were made. (See, e.g., Compl. ¶¶ 22, 26, 31, 35, 37-38, 48, 56-59, 65-67, 69). Thus, plaintiffs adequately pled fraud with respect to these statements.

On a related point, we note that under New York law, "[a] cause of action alleging fraud does not lie where the only fraud claim relates to a breach of contract. A present intent to deceive must be alleged and a mere misrepresentation of an intention to

49

perform under the contract is insufficient to allege fraud."
BanxCorp v. Costco Wholesale Corp., 723 F. Supp.2d 596, 619
(S.D.N.Y. 2010) (quoting WIT Holding Corp. v. Klein, 282 A.D.2d
527, 528, 724 N.Y.S.2d 66, 67-68 (2d Dep't 2001)); accord Int'l
Design Concepts, LLC v. Saks Inc., 486 F. Supp.2d 229, 237
(S.D.N.Y. 2007) ("[A] claim for fraud cause [sic] must be distinct
from a claim for breach of contract."). "Conversely, a
misrepresentation of material fact, which is collateral to the
contract and serves as an inducement for the contract, is
sufficient to sustain a cause of action alleging fraud." Id. "In
cases where a plaintiff alleges both a breach of contract and
fraud, 'a plaintiff must either: (i) demonstrate a legal duty
separate from the duty to perform under the contract: [sic or (ii)
demonstrate a fraudulent misrepresentation collateral or extraneous
to the contract; or (iii) seek special damages that are caused by
the misrepresentation and unrecoverable as contract damages." Int'l
Design, 486 F. Supp.2d at 237 (quoting Bridgestone/Firestone, Inc.
v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)).

In this case, plaintiffs cannot demonstrate that defendant
Plummer bore a legal duty separate from any duty to perform under
an alleged contract, nor do they seek special damages caused by
defendants' misrepresentations that are unrecoverable as contract

damages.[15] However, plaintiffs adequately allege fraudulent misrepresentations collateral to the alleged loan contract.

Plaintiffs allege material misrepresentations of fact separate and apart from defendants' statements regarding their intent to perform their obligations under the loan agreement. Specifically, plaintiffs allege that defendants fraudulently induced plaintiffs to enter into a loan agreement by holding themselves out as the representatives of nonexistent shell corporations that were capable of obtaining loan financing that they had no real ability to obtain. (Compl. ¶¶ 72-77). According to the complaint, defendants made these representation in an effort to convince plaintiffs to enter into the agreement at issue so that defendants could obtain and spend plaintiffs' escrowed funds. (See, e.g., id. ¶ 69); WIT Holding Corp., 282 A.D.2d at 528-29, 724 N.Y.S.2d at 68 (affirming denial of motion to dismiss fraud claim where "plaintiff allege[d]

---

[15] Plaintiffs seek punitive damages in connection with their fraud, conversion, and conspiracy claims. (Compl. ¶¶ 80, 87, 109). However, such damages are not considered "special damages" because they were not caused by defendants' misrepresentations. Xuchang Rihetai Human Hair Goods Co., Ltd. v. Hanyu Int'l USA Inc., 2001 WL 8438, at *2 n.3 (S.D.N.Y. Jan. 3, 2001) ("[Plaintiff's] claim for punitive damages as a result of the allegedly fraudulent misrepresentation are not 'special damages.'"); Excalibur Sys., Inc. v. Aerotech World Trade, Ltd., 1999 WL 1281496, at *3 n.2 (E.D.N.Y. Dec. 30, 1999) ("Punitive damages are not damages caused by reliance on [defendant's] misrepresentations.").

that . . . [defendant] made misrepresentations of fact to induce it to enter into an agreement . . .").

Moreover, defendants allegedly made repeated misrepresentations about not only their intent to perform the contract, but also their ongoing efforts to perform the contract by obtaining loan funds for plaintiffs. (See, e.g., Compl. ¶¶ 22, 26, 31, 35, 37-38, 48, 56-59, 65-67, 69). In this regard, plaintiffs allege that the improper removal of the escrowed funds was not their only injury. (Id. ¶¶ 25-71) Rather, plaintiffs allege that they were also injured when Plummer and the other defendants dissipated the misappropriated funds while defendants assured plaintiffs of their ongoing efforts to provide the loan as promised. (Id. ¶¶ 30-31, 34-37, 42-45, 62). Plaintiffs allege that defendants never made such efforts, and that defendants' misrepresentations were made for the sole purpose of preventing plaintiffs from seeking the return of their escrowed money. (Id.). Hence, here, as in Amusement Indus., "[plaintiffs'] injury cannot be narrowed to the removal of the funds in escrow. To the contrary, [plaintiffs] allege[] that [defendants] . . . improperly used the funds . . . ." 693 F. Supp.2d at 353. Because "[plaintiffs] allege[] that [defendants] induced [them] to hand over money that [defendants] themselves . . . used for their own benefit . . . 'the

fraud and injury [are] connected; it . . . appear[s] in an appreciable sense that damage flowed from fraud as proximate and not remote cause.'" Id. (quoting Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1496 (2d Cir. 1992)). Defendants' misrepresentations are part and parcel of plaintiffs' fraud claim, and are collateral to any alleged contract.

Accordingly, plaintiffs adequately allege fraud based on defendants' asserted misrepresentations both before and after distribution of plaintiffs' escrowed funds. Therefore, we recommend that Plummer's motion to dismiss be denied as to plaintiffs' fraud claim.

G. Conversion

Plummer next attacks plaintiffs' conversion claim. Under New York law, "'conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 347 (1995)). To state a claim for conversion, plaintiff must allege that "(1) the party charged has acted without authorization, and

53

(2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." Seanto Exps. v. United Arab Agencies, 137 F. Supp.2d 445, 451 (S.D.N.Y. 2001). Moreover, if the property is money, "it must be specifically identifiable and subject to an obligation to be returned or otherwise treated in a particular manner." Fleurentin v. McDowell, 2009 WL 2969686, at *7 (E.D.N.Y. Sept. 16, 2009) (citing Republic of Haiti v. Duvalier, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st Dep't 1995)). "Interference with a plaintiff's right to possession may be 'by a wrongful (i) taking; (ii) detention; or (iii) disposal.'" Amusement Indus., 693 F. Supp.2d at 354 (quoting Corporacion Fruticola de Chincha v. Watermelon Depot, Inc., 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008)).

Plaintiffs' allegations that Plummer misappropriated their escrowed funds without any right to do so clearly state a claim for conversion. Cf. id. (finding plaintiff's allegations that defendants appropriated and used escrowed funds, despite the fact that plaintiff did not give authority for the money to be released, sufficient to state claim for conversion). In response, Plummer asserts that plaintiffs failed to allege numerous facts, such as Plummer's bad faith, his awareness that the escrowed funds were

still plaintiffs' property, his intent to appropriate funds that he knew belonged to plaintiffs, plaintiffs' determination that the escrowed funds were to remain their property until released, their rescission of their request for a loan, their failure to allege which defendants controlled the escrow account, and information as to what portion of the funds may have been payable to Plummer or the other defendants for services rendered. (Def.'s Mot. Dismiss 39, 46-47). All of these facts have one thing in common: plaintiffs are not required to allege them to plausibly state a claim for conversion. Hence we recommend that Plummer's motion to dismiss plaintiffs' conversion claim be denied.


H. Negligent Misrepresentation[16]


"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information;

---

[16] The next claims that the complaint presents are for promissory and equitable estoppel, claims that sound in contract. The complaint also alleges the additional tort claims of negligent misrepresentation, conspiracy, and aiding and abetting fraud and conversion, before returning to two more claims sounding in contract -- breach of contract and unjust enrichment. We find it expedient to first address plaintiffs' remaining tort claims, and then address their contract claims, rather than strictly following the order of the complaint and corresponding motion to dismiss.

(2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000); Grammar v. Turits, 271 A.D.2d 644, 645, 706 N.Y.S.2d 453, 455 (2d Dep't 2000). In addition, defendants must have knowledge that if the information given is false, plaintiffs will suffer some sort of injury. Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004).

"In the commercial context, '[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact' depending on whether the person making the representation had 'unique or special expertise,' whether 'a special relationship of trust or confidence existed between the parties,' and 'whether the speaker was aware of the use to which the information would be put and supplied it for that purpose."' Gusmao v. GMT Grp., Inc., 2008 WL 2980039, at *5 (S.D.N.Y. Aug. 1, 2008) (citing Kimmell v. Schaefer, 89 N.Y.2d 257,

56

263-64, 652 N.Y.S.2d 715, 719 (1996)). However, most courts agree
that under New York law, "a special relationship is required in
order to state a claim for negligent misrepresentation." Id.
(citing JP Morgan Chase Bank v. Winnick, 350 F. Supp.2d 393, 402
(S.D.N.Y. 2004)). Furthermore, "'[a] tort cause of action may
accompany a breach of contract only where said contract creates a
relation out of which comes a duty independent of the contractual
relation.'" Ansari v. N.Y. Univ., 1997 WL 257473, at *5 (S.D.N.Y.
May 16, 1997) (citing Fort Ann Cent. Sch. Dist. v. Hogan, 206
A.D.2d 723, 725, 614 N.Y.S.2d 803, 805 (3d Dep't 1994)). "'[I]n the
absence of a special relationship distinct from the contract, a
negligent misrepresentation claim must fail." Id. (citing same; RKB
Enters. Inc. v. Ernst & Young, 182 A.D.2d 971, 972, 582 N.Y.S.2d
814, 816 (3d Dep't 1992)).

Plummer points out that plaintiffs failed to allege any sort
of special relationship with defendants. (Def.'s Mot. Dismiss 50-
51). While plaintiffs respond that defendants "had a duty to
provide accurate information with respect to the terms of the
proposed agreement" (Pls.' Mem. in Opp'n 19), they fail to specify
any facts giving rise to this duty specifically with respect to

defendant Plummer.[17] Hence we recommend that Plummer's motion to dismiss plaintiffs' cause of action for negligent misrepresentation be granted, and that this claim be dismissed without prejudice to allow plaintiffs to assert facts sufficient to allege such a claim with respect to defendant Plummer. See Manswell v. United States, 2010 WL 3219156, at *7 (S.D.N.Y. Aug. 12, 2010) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.")).

I. Conspiracy

> Although New York law does not recognize an independent
> tort of conspiracy, if an underlying, actionable tort is
> established, . . . plaintiff may plead the existence of
> a conspiracy . . . to demonstrate that each defendant's

---

[17] Though the question is not before us, plaintiffs adequately pled such a special relationship with Brooks, who acted as their escrow agent. Amusement Indus., Inc., 2011 WL 867274, at *1 (denying motion to dismiss negligent-misrepresentation claims against only those defendants with alleged "special relationship" with plaintiff in their role as escrow agents, where such defendants allegedly released plaintiff's funds from escrow without authorization); see also Solondz v. Barash, 225 A.D.2d 996, 998-99, 639 N.Y.S.2d 561, 564 (3d Dep't 1996) (concluding fact questions precluded summary judgment with respect to claim of negligent misrepresentation where plaintiff alleged a special relationship with defendant who agreed to act as plaintiff's escrow agent, even in light of disclaimers in escrow agreement that limited defendant's liability under that agreement).

> conduct was part of a common scheme. . . . To establish
> its claim of civil conspiracy, the [plaintiff] must
> demonstrate the primary tort, plus the following four
> elements: (1) an agreement between two or more parties;
> (2) an overt act in furtherance of the agreement; (3) the
> parties' intentional participation in the furtherance of
> a plan or purpose; and (4) resulting damage or injury.

Pasqualini v. MortgageIT, Inc., 498 F. Supp.2d 659, 671 (S.D.N.Y.

2007) (alterations in original) (quoting World Wrestling Fed'n

Entm't v. Bozell, 142 F. Supp.2d 514, 532 (S.D.N.Y. 2001)); see

also Charney v. Sullivan & Cromwell LLP, 2007 WL 2822423, at *3

(N.Y. Sup. Ct. Sept. 27, 2007). "With respect to the conspiracy

elements, 'great leeway should be allowed the pleader, since by the

nature of the conspiracy, the details may not be readily known at

the time of pleading.'" Amusement Indus., 693 F. Supp.2d at 355

(quoting Maersk, Inc. v. Neewra, Inc., 554 F. Supp.2d 424, 458

(S.D.N.Y. 2008)). However, plaintiffs may not "reallege a tort

asserted elsewhere in the complaint in the guise of a separate

conspiracy claim." 380544 Canada, Inc. v. Aspen Tech., Inc., 544 F.

Supp.2d 199, 231-32 (S.D.N.Y. 2008) (citing Aetna Cas. & Sur. Co.

v. Aniero Concrete Co., Inc., 404 F.3d 566, 591 (2d Cir. 2005)).

Under New York law, allegations of conspiracy are "permitted only

to connect the actions of separate defendants with an otherwise

actionable tort." Alexander & Alexander of N.Y., Inc. v. Fritzen,

68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 547 (1986). Thus, "[w]here

59

the acts underlying a claim of conspiracy are the same as those underlying other claims alleged in the complaint, the conspiracy claim is [to be] dismissed as duplicative." 380544 Canada, 544 F. Supp.2d at 232 (citing Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc., 2007 WL 1040809, at *26 (S.D.N.Y. Apr. 2, 2007)).

Plummer raises various objections to plaintiffs' conspiracy claim. (Def.'s Mot. Dismiss 52-55). These objections include plaintiffs' failure to allege: a contract or other agreement on which they can base a conspiracy claim against defendants; an overt act in furtherance of the alleged conspiracy; that Plummer intended to participate in the conspiracy; and facts sufficient to connect Plummer to any alleged conspiracy. (Id. at 52-53). Plummer also states that "[n]one of the conspiracy allegations contains so much as a single supporting detail as to how Plummer himself entered into any conspiracy. Even if the Complaint were augmented to allege a conspiracy via specific allegations against one Defendant, it would still fail to allege a sufficient factual connection between Plummer and the other Defendants and the alleged conspiracy." (Id. at 53). Reading Plummer's motion to make the strongest arguments it suggests, see, e.g., Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotations omitted) (citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)), we take this argument to

assert that plaintiffs fail to plead a conspiracy cause of action against Plummer based on the conduct in which he allegedly participated. We agree with this contention.

Plaintiffs' conspiracy claim alleges nothing more than that defendants conspired to commit "fraud, conversion, and other torts." (Compl. ¶ 103). Because we have already determined that plaintiffs adequately pled the primary torts of fraud and conversion against all defendants, we recommend that plaintiffs' conspiracy claim be dismissed with prejudice.[18] <u>Bahiri v. Madison Realty Capital Advisors, LLC</u>, 2010 WL 5559404, at *3 (N.Y. Sup. Ct. Dec. 23, 2010) (dismissing conspiracy cause of action against defendants where "[t]he conspiracy claim . . . allege[d] nothing more than that [defendants] conspired to commit the . . . tort previously alleged against them . . . [so] plaintiff . . . would

---

[18] Whether or not plaintiffs succeed in pleading a claim for negligent misrepresentation, that claim may not serve as a platform for plaintiffs' civil-conspiracy claim, as negligence-based torts may not serve as a basis for a civil-conspiracy claim. <u>Eaves v. Designs for Fin., Inc.</u>, __ F. Supp.2d __, 2011 WL 1236173, at *15 (S.D.N.Y. Mar. 30, 2011); <u>Rosen v. Brown & Williamson Tobacco Corp.</u>, 11 A.D.3d 524, 525, 782 N.Y.S.2d 795, 795 (2d Dep't 2004) (stating "[s]ince a civil conspiracy cause of action requires a showing of intentional conduct, negligence cannot serve as the underlying tort"). As one cannot conspire to commit a negligent act, plaintiffs cannot base their civil-conspiracy cause of action on the underlying tort of negligent misrepresentation.

[not] be permitted a duplicative recovery on the conspiracy claim with only the additional proof of an agreement to conspire").

### J. Aiding and Abetting Fraud and Conversion

"[I]n order to plead properly a claim for aiding and abetting fraud, the complaint must allege: '(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud.'" Berman v. Morgan Keegan & Co., Inc., 2011 WL 1002683, at *9 (S.D.N.Y. Mar. 14, 2011) (quoting Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co., 64 A.D.3d 472, 476, 883 N.Y.S.2d 486, 489 (1st Dep't 2009)); accord In re Agape Litig., 773 F. Supp.2d 298, 325-26 (E.D.N.Y. 2011) (quoting Kirschner v. Bennett, 648 F. Supp.2d 525, 533 (S.D.N.Y. 2009)) ("[A]iding and abetting conversion requires the 'existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance.'"). When the underlying wrong is based in fraud, the plaintiff must meet the heightened pleading standard of Rule 9(b) with respect to the elements pertaining to the fraud. In re Agape Litig., 773 F. Supp.2d at 325-26 (quoting Silverman Partners, L.P. v. First Bank, 687 F. Supp.2d 269, 286 (E.D.N.Y. 2010)); see also Berman, 2011 WL

1002683, at *7. "Where the complaint 'adequately alleges facts giving rise to a strong inference of [the alleged aider and abetter's] actual knowledge' of the underlying fraud, the plaintiff has adequately pled the knowledge element." Berman, 2011 WL 1002683, at *9 (quoting JP Morgan Chase Bank v. Winnick, 406 F. Supp.2d 247, 252, 256 (S.D.N.Y. 2005)). Because "the same activity is alleged to constitute the primary violation underlying both claims . . . [k]nowledge of the primary violation with respect to one claim will entail knowledge of the primary violation with respect to the other." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp.2d 349, 360 (S.D.N.Y. 2007). "Substantial assistance exists where '(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.'" Berman, 2011 WL 1002683, at *10 (quoting UniCredito Italiano SPA v. JP Morgan Chase Bank, 288 F. Supp.2d 485, 502 (S.D.N.Y. 2003)).

Plummer's only objection to plaintiffs' aiding-and-abetting claim[19] is that plaintiffs fail to explain how he could be involved

---

[19] Plummer also asserts that the underlying torts were not adequately pled (Def.'s Mot. Dismiss 55-56); we have already

in a fraudulent scheme in New York given his residence in Tennessee and CDT's incorporation in Switzerland. (Def.'s Mot. Dismiss 55-56). Hence he asserts that plaintiffs "cannot allege that Plummer was even present at the discussions repeatedly attributed to the Defendants collectively." (Id. at 55). This objection is patently frivolous in the face of plaintiffs' allegations that Plummer communicated with them, and with the other defendants, via telephone, e-mail, and letter. (See, e.g., Compl. ¶¶ 45, 48-50, 64-70).

In the complaint, plaintiffs allege that only Richmond, Brooks, and Charles aided and abetted the other defendants' fraud and conversion; they omit Plummer from their pleadings on this specific cause of action. (See Compl. ¶¶ 110-15). As such, plaintiffs' pleading does not explicitly assert a claim for aiding and abetting fraud and conversion against Plummer. (Id.). However, plaintiffs asserted in their opposition to the present motion that they had adequately pled aiding-and-abetting claims against Plummer. (Pls.' Mem. in Opp'n 20-21). Plaintiffs note that they alleged Plummer's direct involvement in (and therefore, knowledge of and substantial assistance in) the alleged conspiracy to defraud

---

rejected this assertion.

plaintiffs and/or to convert their escrowed funds. (Id.). Most pertinently, plaintiffs point to their allegations that Plummer made several fraudulent promises to provide loan funding by various dates, with knowledge that he had no ability or intent to do so, in order to delay plaintiffs from seeking the return of their escrowed funds. (Id.). They further allege that these misrepresentations allowed Plummer and the other defendants time to dissipate the funds, directly causing plaintiffs' injury. (Id. at 22). Plaintiffs assert that these facts are sufficient to allow their aiding-and-abetting claims against Plummer to survive a motion to dismiss. (Id.). We do not agree.

As written, plaintiffs' complaint does not seek relief from defendant Plummer under a theory of aiding and abetting fraud and conversion. (Compl. ¶¶ 110-115). Had plaintiffs asserted an aiding-and-abetting claim against Plummer, we would be inclined to believe that such a claim was plausible on the facts alleged and should survive a motion to dismiss. Since, however, plaintiffs did not originally assert this claim in their complaint, we will not evaluate its plausibility at this time. See Jamison v. Chapman, 2009 WL 3762348, at *1, n.1 (N.D.N.Y. Nov. 9, 2009) (finding defendants' argument in favor of dismissing deliberate-indifference cause of action under Rule 12(b)(6) moot in part because they were

65

not named defendants in that claim); <u>Thomas v. Lasalle Bank Nat.</u>
<u>Ass'n</u>, 79 A.D.3d 1015, 1018, 913 N.Y.S.2d 742, 745 (2d Dep't 2010)
(declining to address appellants' contention that a cause of action
for waste and accounting should be dismissed as asserted against
them because plaintiff did not name the appellants in that cause of
action, and only sought relief against other defendants). We
instead recommend that plaintiffs' aiding-and-abetting claims,
insofar as purportedly directed at Plummer, be dismissed without
prejudice, and that plaintiffs be granted leave to amend their
complaint to allege their aiding-and-abetting claims explicitly
against him. With that, we proceed to address plaintiffs' contract-
based claims.


### K. <u>Breach of Contract, Unjust Enrichment, and Promissory and Equitable Estoppel</u>

Plaintiffs have asserted various contract-related claims:
breach of contract, promissory and equitable estoppel, and unjust
enrichment. Unsurprisingly, Plummer asserts that plaintiffs failed
to state a valid claim under any of these theories. We address
these claims, and Plummer's objections to them, in turn.

1. Breach of Contract

"Under New York state law, the elements of a breach of contract [sic] claim are: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) [resulting] damages." MBIA Ins. Corp. v. Royal Bank of Canada, 706 F. Supp.2d 380, 396 (S.D.N.Y. 2009) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000)). "New York law recognizes both express and implied contracts." Soley v. Wasserman, 2011 WL 4352384, at *10 (S.D.N.Y. Aug. 11, 2011). "An express contract is an agreement created by words, either written or spoken." Id. (citing Leibowitz v. Cornell Univ., 584 F.3d 487, 506-07 (2d Cir. 2009)). "It is not essential to the validity of a contract that the consideration be recited therein since it may be implied, or proved by parol evidence." Anonymous v. Anonymous, 2004 WL 396492, at *7 (N.Y. Sup. Ct. Feb. 9, 2004) (citing Richman v Brookhaven Servicing Corp., 80 Misc.2d 563, 564, 363 N.Y.S.2d 731, 733 (N.Y. Dist. Ct. 1975)); In re Toscano, __ F. Supp.2d __, 2011 WL 3235770, at *18 (E.D.N.Y. July 26, 2011) (quoting Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004)).

Plaintiffs' original breach-of-contract claim is based on allegations that during the fall of 2010, Richmond and Plummer

promised to return the $500,000.00 in escrow funds to plaintiffs, plus compensatory damages, in exchange for plaintiffs' agreement to refrain from enforcing their legal rights to the escrow funds for an unspecified time. (Compl. ¶¶ 117-21). Neither party submitted a fully executed written contract with their pleadings. However, plaintiffs allege facts sufficient to find it plausible that the parties entered into a contract to return the escrowed funds in exchange for plaintiffs' forbearance.

Plaintiffs allege that defendants agreed to return the $500,000.00 escrow plus "associated compensatory damages." (Compl. ¶ 117). The allegations tending to show the contract terms consist primarily of references to (1) a phone conference between Richmond and plaintiffs on behalf of Richmond and Plummer (id. ¶ 45); (2) three e-mails to plaintiffs sent from Richmond on behalf of himself and Plummer (id. ¶¶ 56, 60, 62); and (3) conversations during which Richmond and Plummer "advised" and "promised" plaintiffs that they would return the $500,000.00. (Id. ¶¶ 44, 70).

According to the complaint, defendants first promised to return plaintiffs' funds in "mid-October 2010," at which time defendants "advised" plaintiffs that the funds would be returned "upon demand." (Id. ¶ 44). During a phone conference held October

68

13, 2010, Richmond advised plaintiffs that the $500,000.00 would be returned in a week to ten days. (Id. ¶ 45). The first of the e-mails, dated October 21, 2010 and referenced twice, allegedly reiterated that the escrowed funds would be returned to plaintiffs upon their request. (Id. ¶¶ 53, 56). We note that plaintiffs never specifically allege that they subsequently requested the return of their escrowed funds, though such a request can be inferred from the later paragraphs of the complaint. (E.g., id. ¶ 70). The second e-mail, dated November 10, 2010, allegedly stated that the escrowed funds would be returned along with some unspecified fees and costs, and that the loan itself would be funded no later than November 15, 2010. (Id. ¶ 60). The third e-mail, dated November 12, 2010, allegedly stated that Richmond and Plummer intended to return the $500,000.00 in escrowed funds plus interest and fees totaling $55,000.00. (Id. ¶ 62). The only other reference in the complaint to a contract under which defendants agreed to return the escrowed funds is a conclusory statement that Richmond and Plummer repeatedly promised to do so over several months during late 2010 and early 2011. (Id. ¶ 70).

Despite the foregoing, plaintiffs plead neither an agreed-upon time frame for returning the funds nor an agreed-upon amount of "compensatory damages." Plaintiffs plead that their only duty under

the contract was forbearing from "enforcing their rights." (Id. ¶¶ 118-19). It is unclear what rights specifically they delayed in exercising as consideration under the alleged contract. None of the conversations, phone calls, or e-mails that could possibly be construed to demonstrate the terms of an agreement between defendants and plaintiffs explicitly mention any duty on behalf of the plaintiffs as consideration for return of the funds. (See id. ¶¶ 44-45, 53, 56, 60, 62, 70). However, plaintiffs plead that they "did not immediately take action to enforce their rights . . . to [their] detriment." (Id. ¶ 117). Plaintiffs further allege that they performed under "the agreement [to return the escrowed funds and associated compensatory damages] . . . by, inter alia, forbearing from enforcing their rights." (Id. ¶ 119). Drawing all inferences in favor of the plaintiffs, as we must, Achtman, 464 F.3d at 337, plaintiffs' allegations can be read as reflecting at least an implicit quid pro quo that plaintiffs would withhold taking legal action for a reasonable period during which defendants were to return the escrowed funds. (See Compl. ¶¶ 44-45, 53, 56, 60, 62, 70).

Furthermore, plaintiffs sufficiently allege their performance under such a contract, as they delayed in seeking court intervention to recover their misappropriated escrowed funds. (Id.

¶¶ 77, 118). Plaintiffs also sufficiently allege defendant Plummer's breach of that contract, as they assert that defendants, including Plummer, failed to return the escrowed funds, and have reimbursed plaintiffs only $28,000.00 to date. (Id. ¶ 71). Finally, plaintiffs allege damages in the amount of the allegedly misappropriated escrow and in their delay in acting to recover their funds. (Id. ¶¶ 118, 121).

Based on the foregoing, plaintiffs plausibly allege the existence of a contract to return the $500,000.00 in escrowed funds in exchange for their forbearance from asserting any rights to such funds for a reasonable time. Therefore, we recommend that Plummer's motion to dismiss this version of plaintiffs' claim for breach of contract be denied. However, this conclusion does not end our discussion of plaintiffs' breach-of-contract claim.

Though plaintiffs base their breach-of-contract claim on an alleged contract for the return of the escrowed funds (id. ¶ 117), the complaint also alleges facts that suggest the existence and breach of a different contract. Plaintiffs allege that "the defendants represented to the plaintiffs that if they provided the defendants with $500,000, the defendants would, in return, provide a loan to the plaintiffs of €35 million, along with collateral for

71

that loan." (Compl. ¶¶ 16, 22-24). Plaintiffs then allege that defendants continued to promise that the loan would be funded, but ultimately provided plaintiffs neither a loan nor loan collateral. (Id. ¶¶ 69-71).

That plaintiffs did not label these allegations as a breach-of-contract claim is not fatal to their pleading, since we must look to the factual allegations of the complaint as defining the nature of the claim rather depend upon the legal labels affixed to those factual allegations. See, e.g., Northrup v. Hoffman of Simsbury, Inc., 134 F.3d 41, 45-46 (2d Cir. 1997) (stating that "[t]he failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim") (citing cases); accord Simonton v. Runyon, 232 F.3d 33, 36-37 (2d Cir. 2000) (citing Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 712 n.4 (2d Cir. 1980)) (stating that "[g]enerally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim").

Reading Plummer's motion to assert the strongest arguments it suggests, see, e.g., Green, 260 F.3d at 83 (2d Cir. 2001) (internal quotations omitted) (citing Graham, 89 F.3d at 79 (2d Cir. 1996)),

72

Plummer appears to assert a Statute-of-Frauds defense to plaintiffs' breach-of-contract claim. (Def.'s Mot. Dismiss. 49, 57) ("Plaintiffs have not plead that any writing confirming the requested financing for Plaintiffs' proposed stock purchase was ever finalized . . . ;" "other than a conclusory allegation of a verbal contract to return the escrow funds, no contract is mentioned in the Complaint.") (internal citation omitted).

However, it is improper for the court to consider Plummer's affirmative defense at this time. An affirmative defense, such as the Statute of Frauds, may be raised by a motion to dismiss under Rule 12(b)(6) without resort to summary judgment proceedings only if the defense appears on the face of the complaint. See, e.g., S.E.C. v. Gabelli, 653 F.3d 49, 60 (2d Cir. 2011) (citing Harris v. City of N.Y., 186 F.3d 243, 250 (2d Cir. 1999) (statute-of-limitations defense)); Intuition Consol. Grp., Inc. v. Dick Davis Publ'g Co., 2004 WL 594651, at *1 n.2 (S.D.N.Y. Mar. 25, 2004) (explaining that "the Second Circuit has approved the consideration of an affirmative defense on a motion to dismiss pursuant to Rule 12(b)(6) if the defense appears on the face of the complaint."); McCoy v. Goord, 255 F. Supp.2d 233, 249 (S.D.N.Y. 2003) (citing Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74-75 (2d Cir. 1998)); see also 5B Charles Alan Wright, Arthur R. Miller, Federal

73

Practice & Procedure § 1357 (3d ed. 2004) ("[T]he complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy; but for this to occur, the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion."). This is because affirmative defenses "may be 'riddled with questions of fact which the Defendants must establish in order to bar [Plaintiff's] claims . . . .'" Graham Hanson Design LLC v. 511 9th LLC, 2011 WL 744801, at *2 (S.D.N.Y. Feb. 24, 2011) (alteration in original) (citing Ortiz v. City of N.Y., 2010 WL 5116129, at *1 (E.D.N.Y. Dec. 13, 2010)); E. Gluck Corp. v. Rothenhaus, 585 F. Supp.2d 505, 512 (S.D.N.Y. 2008) ("While affirmative defenses may be raised in a Rule 12(b)(6) motion, a motion to dismiss is not the proper mechanism to raise defenses that are necessarily fact-intensive.").

Plaintiffs plead that they fully performed under the contract by providing the $500,000.00 escrow to defendants. (Compl. ¶ 24). Defendants, including Plummer, allegedly breached this contract by failing to provide plaintiffs with a €35,000,000.00 loan and associated collateral. (E.g., id. ¶¶ 16, 69-71) Plaintiffs allege damages in the form of delay in asserting their rights to return of

74

the escrowed funds (e.g., id. ¶ 69), which delay provided defendants time to dissipate such funds (e.g., id. ¶ 31), and as a result of which plaintiffs "did not explore other loan or financing opportunities." (Id. ¶ 77).

Based on the foregoing, we recommend that Plummer's motion to dismiss this aspect of plaintiffs' breach-of-contract claim also be denied.

### 2. Promissory and Equitable Estoppel

"Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract." Bader v. Wells Fargo Home Mortg. Inc., 773 F. Supp.2d 397, 414 (S.D.N.Y. 2011) (quoting Randolph Equities, LLC v. Carbon Capital, Inc., 648 F. Supp.2d 507, 523 (S.D.N.Y. 2009)). "The elements of a cause of action based upon promissory estoppel are a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise."[20] Schwartz v. Miltz, 77 A.D.3d 723, 724, 909 N.Y.S.2d 729,

---

[20] A plaintiff is additionally required to demonstrate an "unconscionable injury" when plaintiff invokes promissory estoppel to avoid a requirement under the Statute of Frauds. Polargrid LLC v. Videsh Sanchar Nigam Ltd., 2006 WL 903184, at *3

731 (2d Dep't 2010) (quoting Agress v. Clarkstown Cent. School
Dist., 96 A.D.3d 769, 771, 895 N.Y.S.2d 432, 434 (2d Dep't 2010)).
"A promissory estoppel claim may proceed jointly with a breach of
contract claim only where it is not clear that a valid contract
exists." BLD Prods., LLC v. Viacom, Inc., 2011 WL 1327340, at *15
(S.D.N.Y. Mar. 31, 2011) (dismissing promissory-estoppel claim
pursuant to defendant's 12(b)(6) motion because parties did not
dispute the existence of an enforceable contract governing the
dispute); accord R.B. Ventures, Ltd v. Shane, 112 F.3d 54, 60 (2d
Cir. 1997); Brown v. Brown, 12 A.D.3d 176, 176, 785 N.Y.S.2d 417,
419 (1st Dep't 2004) (finding that a breach-of-contract claim
cannot justify recovery under tort theories such as promissory
estoppel absent proof of legal duty independent of contract).
However, plaintiffs may plead the alternative theories of

_____

(S.D.N.Y. Apr. 7, 2006) (citing Jacobs v. Carsey-Werner
Distribution, Inc., 1994 WL 116077, at *4 (S.D.N.Y. Mar. 30,
1994)) (stating that the element of unconscionability is required
only when promissory estoppel is asserted to contravene the
Statute of Frauds); Foster v. Kovner, 44 A.D.3d 23, 29, 840
N.Y.S.2d 328, 333 (1st Dep't 2007) (stating that "a claim of
promissory estoppel will allow plaintiff to circumvent the
Statute of Frauds if there is at least an allegation of
infliction of unconscionable injury on plaintiff as a result of
any reliance he placed on defendant's alleged promises" (internal
citations omitted)). An unconscionable injury is one "beyond that
which flows naturally from the non-performance of the
unenforceable agreement." Multi-Juice, S.A. v. Snapple Beverage
Corp., 2006 WL 2683429, at *4-5 (S.D.N.Y. Sept. 18, 2006)
(internal quotations omitted) (quoting Merex A.G. v. Fairchild
Weston Sys., 29 F.3d 821, 826 (2d Cir. 1994)).

76

promissory estoppel and breach of contract in the event that the existence of an enforceable contract is not conceded by defendant. Polargrid, 2006 WL 903184, at *3 (denying defendant's motion to dismiss plaintiff's promissory-estoppel claim under Rule 12(b)(6) because plaintiff also alleged the existence of a written contract, noting plaintiff was permitted to assert both breach-of-contract and promissory-estoppel causes of action as defendant disputed the validity of the relevant contract). Because Plummer disputes the existence of a valid contract in this case (Def.'s Mot. Dismiss 57-58), plaintiffs may plead these claims in the alternative.

Plaintiffs allege that defendants clearly and unambiguously promised that, in exchange for plaintiffs' $500,000.00 in escrowed funds, they would provide plaintiffs with a €35,000,000.00 loan and collateral for that loan. (Compl. ¶¶ 16, 22). In fact, plaintiffs allege that defendants, including Plummer, repeatedly renewed their promise to secure loan financing in return for plaintiffs' $500,000.00. (See, e.g., id. ¶ 48). Plaintiffs allege that they relied on these promises both when initially providing defendants with such funds and when delaying their requests for return of the funds. (See, e.g., id. ¶¶ 90-93). Despite their representations, defendants never obtained a loan for plaintiffs or refunded the full $500,000.00; defendants instead reimbursed plaintiffs only

$28,000.00. (Id. ¶ 71). Plaintiffs allege that they were injured by this reliance in not exploring other loan or financing opportunities and not immediately filing suit to protect their rights. (Id. ¶ 77). These facts are sufficient to allege the elements of promissory estoppel.

Plummer's only discernible objection to plaintiffs' promissory-estoppel claim is based on New York's Statute of Frauds. Plummer alleges that "[p]laintiffs have not plead [sic] that any writing confirming the requested financing for Plaintiffs' proposed stock purchase was ever finalized . . . ." (Def.'s Mot. Dismiss 48-49) (citing N.Y. Gen. Oblig. Law § 5-701 (McKinney 2011)). We read this assertion to raise a Statute-of-Frauds defense with respect to the original agreement to provide the loan. However, because plaintiffs are not pleading promissory estoppel to circumvent a Statute-of-Frauds requirement, no allegation of unconscionable injury is required to sustain the present claim. See Multi-Juice, S.A., 2006 WL 2683429, at *4 (finding that because plaintiff's promissory-estoppel claim sought to circumvent the Statute of Frauds, plaintiff was required to demonstrate that it sustained an unconscionable injury); Foster, 44 A.D.3d at 29-30, 840 N.Y.S.2d at 333 (finding on appeal from order granting motion to dismiss promissory-estoppel claim that the promissory-estoppel claim should

be reinstated, despite plaintiff's failure to allege unconscionable injury in the complaint, to the extent that the Statute of Frauds did not bar breach-of-contract claims).

Plaintiffs allege facts sufficient to survive a motion to dismiss with respect to the original agreement to provide the loan even in light of Plummer's Statute-of-Frauds defense. Thus, we recommend that Plummer's motion to dismiss plaintiffs' promissory-estoppel claim based on the original promise to provide loan funds be denied.

The complaint also alleges facts sufficient to bring a second promissory-estoppel claim. (See, e.g., Compl. ¶¶ 90-93). Plaintiffs allege that Richmond and Plummer promised to return the $500,000.00 in escrow funds to plaintiffs, plus compensatory damages, on which promises plaintiffs relied in refraining from enforcing their legal rights to the escrow funds for an unspecified time. (Id. ¶¶ 77, 117-21). These alleged promises, as pled, were clear and unambiguous.[21] (See id. ¶¶ 44 (Plummer and another defendant

---

[21] Though some of plaintiffs' pleadings demonstrate that defendants promised to return the funds only upon plaintiffs' request (Compl. ¶ 56), the vast majority demonstrate that defendants promised to return the funds unconditionally, or if the "contemplated transactions were no [sic] effectuated]." (Id. ¶¶ 53-54, 60, 62-63, 70, 74, 97). Even if the promises were

"falsely advised plaintiffs that the $500,000 escrow was intact and would be returned to plaintiffs upon demand"); 53 (per e-mail, Richmond stated on behalf of himself and Plummer "that Richmond and Plummer would refund the $500,000 escrow . . ."); 60 (per e-mail, Richmond promised to "refund the $500,000, plus some additional fees and costs" on behalf of himself and Plummer); 62 (per e-mail, Richmond stated that defendants "intended to refund the $500,000, plus interest and fees of "$55,000" on behalf of himself and Plummer); 70 (Plummer "repeatedly promised to reimburse plaintiffs for the escrow that [he and the other defendants] had converted")). These specific statements at the very least "'suffice . . . to create a factual question . . . '" as to whether defendants promised to refund plaintiffs' money once they were unable to effectuate the loan. Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc., 804 F.2d 787, 793 (2d Cir. 1986) (quoting Dominquez v. Manhattan & Bronx Surface Transit Operating Auth., 46 N.Y.2d 528, 532, 415 N.Y.S.2d 634, 636 (1979)) (finding that the question of whether there was a clear and unambiguous promise was properly submitted to the jury).

--------

conditional upon plaintiffs' request to return the funds, we infer from the pleadings that plaintiffs made such a request. (See id. ¶ 70). Additionally, if the promises were conditioned upon the nonoccurrence of the "contemplated transactions," the pleadings successfully allege that such a condition was met. (E.g., id. ¶ 71).

Plaintiffs' pleading emphasizes that defendants' repeated promises to return the loan funds were intended to induce plaintiffs' reliance by persuading them to forbear in asserting their rights to the escrowed funds. (Compl. ¶¶ 77, 119). Finally, plaintiffs plausibly plead an injury as a result of such forbearance (E.g., id. ¶¶ 77), in the form of their delay in exercising their right to return of the escrowed funds and missed opportunities to seek alternative sources of financing. Cf. Kaye v. Grossman, 1999 WL 33465, at *2 (S.D.N.Y. Jan. 27, 1999) (finding that with respect to a promissory-estoppel claim brought under New York law, "plaintiff's testimony regarding defendant's [representations that she would repay her husband's debt] create[d] a triable issue as to whether a clear and unambiguous promise to repay the debt was made, and whether the plaintiff reasonably relied on that promise in deciding not to take immediate legal action, an act of forbearance that may well have caused injury to plaintiff").

Therefore, we recommend that Plummer's motion to dismiss plaintiffs' promissory-estoppel claim based on defendants' promise to refund the escrow be denied.

Plaintiffs assert a claim for equitable estoppel on the same

bases as their claim for promissory estoppel. (Compl. ¶¶ 88-94).
Plummer similarly moves to dismiss this claim. (Def.'s Mot. Dismiss
48-50). "[The] doctrine [of equitable estoppel] precludes a party
at law and in equity from denying or asserting the contrary of any
material fact which he has induced another to believe and to act on
in a particular manner." Holm v C.M.P. Sheet Metal, 89 A.D.2d 229,
234, 455 N.Y.S.2d 429, 433 (4th Dep't 1982). "It does not operate
to create rights otherwise nonexistent; it operates merely to
preclude the denial of a right claimed otherwise to have arisen."
Id. The elements of an equitable-estoppel claim with respect to the
party being estopped are "(1) conduct amounting to false
representation or concealment of material facts, (2) intention or
expectation that the other party will act upon such conduct, and
(3) actual or constructive knowledge of the true facts." Forman v.
Guardian Life Ins. Co. of Am., 2009 WL 3790200, at *5 (N.Y. Sup.
Ct. Sept. 25, 2009) (internal citations omitted); Health-Loom Corp.
v. Soho Plaza Corp., 272 A.D.2d 179, 181, 709 N.Y.S.2d 165, 167
(1st Dep't 2000). "The party asserting estoppel must show [his] .
. . (1) lack of knowledge of the true facts; (2) reliance upon the
conduct of the party estopped; and (3) a prejudicial change in his
position." Forman, 2009 WL 3790200, at *5 (internal citations
omitted).

82

Plaintiffs' equitable-estoppel claim fails because they seek only money damages as a remedy (<u>e.g.</u>, Compl. ¶ 93), which is not available as relief under equitable-estoppel principles. <u>SCM Corp. v. Xerox Corp.</u>, 507 F.2d 358, 363 (2d Cir. 1974) ("[I]t is basic that equitable relief will not be granted where an adequate remedy at law exists. Money damages if determinable with a reasonable degree of certainty constitute such an adequate remedy."); <u>accord</u> <u>In re Shondel J. v. Mark D.</u>, 7 N.Y.3d 320, 326, 853 N.E.2d 610, 613 (2006) ("The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted."); <u>Clifford R. Gray, Inc. v. LeChase Const. Servs., LLC</u>, 31 A.D.3d 983, 987, 819 N.Y.S.2d 182, 186 (3d Dep't 2006) (stating that one invokes an equitable-estoppel claim "to prohibit a party from engaging in certain conduct" and citing a number of examples); 57 N.Y. Jur. 2d <u>Estoppel, Ratification, and Waiver</u> § 5 (2011) (internal citations omitted) ("Equitable estoppel is not a cause of action or a defense; it is, rather, an equitable bar to the assertion of a defense or claim . . . [that] is invoked to prohibit a party from engaging in certain conduct and cannot be used as the basis to recover money damages."). Furthermore, a number of New York courts consider equitable estoppel an affirmative defense, not

an offensive claim. E.g., Branch Banking & Trust Co. v. S. Fork Res. LLC, 2011 WL 4119172, at *3 (N.Y. Sup. Ct. Aug. 31, 2011) ("Equitable estoppel is an affirmative defense that precludes a party from asserting a right, privilege, or advantage under principles of detrimental reliance."); Fisk Bldg. Assocs. LLC v. Shimazaki II, Inc., 76 A.D.3d 468, 469, 907 N.Y.S.2d 2, 4 (1st Dep't 2010).

In the present case, plaintiffs do not seek to preclude defendants from asserting any right, privilege, defense, or claim, or from engaging in certain conduct. Plaintiffs only seek judgment in their favor in an amount of at least $500,000.00. (E.g., Compl. ¶¶ 93, 101; Prayer for Relief). Based on the foregoing, plaintiffs have not pled a plausible equitable-estoppel claim. Therefore we recommend that plaintiffs' equitable-estoppel claim be dismissed with prejudice. Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003) (explaining that "it is well established that leave to amend a complaint need not be granted when amendment would be futile").

3. Unjust Enrichment

"Under New York law, a plaintiff has stated a claim for unjust enrichment when it alleges '(1) that the defendant benefitted; (2)

84

at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" Amusement Indus., 693 F. Supp.2d at 356 (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)); accord Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006). Therefore, in order to plead a claim for unjust enrichment, plaintiffs need only allege that Plummer has benefitted inequitably at their expense. At this stage of the case, plaintiffs' allegations more than adequately state such a claim.

Plummer asserts that plaintiffs cannot proceed with their unjust-enrichment claim because they have not adequately alleged a contract between Plummer and plaintiffs, and he therefore cannot have benefitted at their expense. (Def.'s Mot. Dismiss 59). This argument is not merely a non sequitur, it is wrong as a matter of law. An unjust-enrichment claim does not require the presence of a contract; in fact, such a claim is precluded if an enforceable contract exists. See, e.g., Beth Israel, 448 F.3d at 586-87; accord Icebox-Scoops v. Finanz St. Honore, B.V., 676 F. Supp.2d 100, 114 (E.D.N.Y. 2009) ("[A]n enforceable contract between the parties concerning a particular subject matter precludes quasi-contractual recovery in unjust enrichment for claims arising out of that subject matter." (quoting Consol. Risk Servs., Inc. v. Auto.

<u>Dealers WC Self Ins. Trust</u>, 2007 WL 951565, at \*7 (N.D.N.Y. Mar. 27, 2007))). "This is true 'even if one of the parties to the lawsuit is not a party to the contract.'" <u>Icebox-Scoops</u>, 676 F. Supp.2d at 114 (quoting <u>Air Atlanta Eng'g Ltd. v. SP Aircraft Owner I, LLC</u>, 637 F. Supp.2d 185, 196 (S.D.N.Y. 2009)).

Although a plaintiff cannot recover on an unjust-enrichment claim if there exists an enforceable contract, "New York permits the alternative pleading of breach of contract and unjust enrichment claims -- and the survival of both claims at the motion to dismiss stage -- 'where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue.'" <u>Id.</u> (quoting <u>IIG Capital LLC v. Archipelago, L.L.C.</u>, 36 A.D.3d 401, 405, 829 N.Y.S.2d 10, 14 (1st Dep't 2007)). Hence, even if plaintiffs have successfully pled a breach-of-contract claim, their claim of unjust enrichment should survive at this stage of the case with respect to defendants' alleged misappropriation of the escrowed funds. (Compl. ¶¶ 122-23).

L. <u>Veil-Piercing</u>

Finally, we address Plummer's assertion that plaintiffs' lawsuit must fail because they (1) did not name CDT as a defendant

86

and (2) failed to allege facts adequate to allow plaintiffs to pierce CDT's corporate veil and sue Plummer individually. (Def.'s Mot. Dismiss 13-15, 25-29). Plaintiffs acknowledge that they did not assert a veil-piercing claim. (Pls.' Mem. in Opp'n 15). Hence we examine briefly whether plaintiffs' suit must fail in the absence of a separate veil-piercing claim, as Plummer asserts.

"Ordinarily, a corporate officer is not personally liable for any financial obligations of the corporation absent unusual circumstances, such as fraud or facts warranting piercing the corporate veil." Gabr Int'l Trading Corp. v. Birdsall, 2009 WL 595605, at *3 (E.D.N.Y. Mar. 6, 2009) (citing Nanjing Textiles IMP/EXP Corp., Ltd. v. NCC Sportswear Corp., 2006 WL 2337186, at *14 (S.D.N.Y. Aug. 11, 2006)). This principle, however, does not save this aspect of defendant's motion.

Plummer can be held individually liable even if plaintiffs contracted only with CDT and not with Plummer individually. First, if CDT is not a valid corporate entity, then Plummer can be held liable for causes of action brought against the invalid corporation. Id. at *3 n.3 (citing Animazing Entm't, Inc. v. Louis Lofredo Assocs., Inc., 88 F. Supp.2d 265, 270-71 (S.D.N.Y. 2000)) ("An individual who does business as a nonexistent corporation is

87

personally liable in suits brought against the 'corporation.'");
accord BCI Constr., Inc. v. Whelan, 67 A.D.3d 1102, 1103, 888
N.Y.S.2d 272, 273 (3d Dep't 2009). Second, a corporate officer or
employee who engages in a tort in the course of his or her
corporate duties may be held individually liable for such tortious
conduct. Rays Trading (H.K.) Co. Ltd. v. Judy-Philippine, Inc.,
1998 WL 355422, at *4 (S.D.N.Y. July 2, 1998) (quoting Am.
Airlines, Inc. v. Am. Coupon Exch., Inc., 721 F. Supp. 61, 63
(S.D.N.Y. 1989)). Finally, if Plummer acted on his own behalf and
not on behalf of CDT, the existence of CDT would not shield him
from liability.

Plaintiffs' allegations on this point state that "Plummer
purported to trade as [CDT] (the 'Swiss Shell'), however, it was
later revealed that this entity was merely a shell, that Plummer
used to ensnare the plaintiffs in the defendants' scheme." (Compl.
¶ 15).[22] Moreover, in discussing defendants' allegedly fraudulent
misappropriation of escrow funds and their subsequent attempts to
delay plaintiffs' efforts to recover their money, plaintiffs state

---

[22] Similarly, plaintiffs allege that "Richmond traded under
the name [CASA] (the "Costa Rican Shell"), which purported to be
a Costa Rican business organization, however, it was later
revealed that this entity had no real existence, was a shell, and
Richmond was a resident of Brooklyn." (Compl. ¶ 14).

that Plummer wrote a letter, "dated October 18, 2010, to Richmond designed to be forwarded to plaintiffs, []using the Swiss Shell's letterhead and a date in European fashion . . .[that was] written in a misleading fashion to make it appear that it originated from a European entity, as opposed to a Tennessean, with no connection to Switzerland other than the use of the legitimate looking letterhead." (Id. ¶¶ 48-49).

Assuming the truth of these allegations, as we must on a motion to dismiss, see, e.g., Achtman, 464 F.3d at 337, we understand plaintiffs to allege that CDT and CASA were not existing corporations. Instead, they allege, Richmond and Plummer purported to represent non-existent corporate entities in order to convince plaintiffs that they were legitimate businessmen. In such a circumstance, piercing the corporate veil is unnecessary to find either defendant individually liable. See Gabr Int'l Trading Corp., 2009 WL 595605, at *3 n.3 (citing Animazing Entm't, Inc., 88 F. Supp.2d at 270-71). Moreover, as plaintiffs allege that Plummer and the other defendants committed several torts, including fraud and conversion, while acting within the scope of their purported corporate positions, the absence of allegations sufficient to pierce the corporate veils of CASA or CDT does not defeat those claims. Cf. Rays Trading (H.K.) Co. Ltd., 1998 WL 355422, at *4.

89

As for plaintiffs' claims that sound in contract, Plummer is correct that CDT's veil would have to be pierced in order for him to be individually liable for any of CDT's express or implied contractual obligations. However, Plummer himself asserts that plaintiffs never entered into a contract with CDT. (See Def.'s Mot. Dismiss 27) ("[E]ach and every reference to illicit conduct ostensibly committed by "Plummer" [in the complaint] is directly referable to CDT, the corporation entity [sic] with which Plaintiffs would have contracted, had there been a contract[.]"). It is difficult to understand how Plummer can assert that CDT's presence as the contracting party shields him from individual liability while simultaneously asserting that CDT never contracted with plaintiffs. Moreover, as previously stated, plaintiffs' allegations are sufficient to state claims for promissory estoppel and unjust enrichment against Plummer himself, without reference to CDT. Hence we recommend denial of Plummer's motion insofar as it would require dismissal on the basis of plaintiffs' failure to allege a veil-piercing claim.

<u>CONCLUSION</u>

For the reasons discussed above, we recommend that Plummer's motion to dismiss for failure to state a claim be granted as to

plaintiffs' claims of negligent misrepresentation, civil conspiracy, aiding and abetting fraud and conversion, and equitable estoppel, and denied in all other respects. We also recommend that plaintiffs be granted leave to amend their complaint in two respects: (1) to allege a special relationship with Plummer sufficient to sustain their negligent-misrepresentation claim and (2) to allege a claim of aiding and abetting fraud and conversion against Plummer.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable J. Paul Oetken, Room 620, 500 Pearl Street, New York, New York, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York. Failure to file timely objections may constitute a waiver of those objections both in the District court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 470 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED: New York, New York
        October 26, 2011

                                    RESPECTFULLY SUBMITTED,


                                    _____
                                    MICHAEL H. DOLINGER
                                    UNITED STATES MAGISTRATE JUDGE



Copies of the foregoing Report and Recommendation have been sent
today to:

Andrez Shumree Carberry, Esq.
Fox Rothschild, LLP
100 Park Avenue
New York, NY 10019
(212)-878-7900
Fax: (212) 692-0940

Mr. Tom C. Plummer
217 Lilac Circle
Franklin, TN 37064
Fax: (615) 829-8373

Neal Sanford Comer, Esq.
Neal S. Comer, Attorney at Law
445 Hamilton Avenue
White Plains, NY 10601
914-683-5400
Fax: 914-428-1660

Mr. Patrick Charles
180 Vine St.
Denver, CO 80206


                                    92